IN THE OREGON TAX COURT
REGULAR DIVISION

Bhagwati P. PODDAR,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*

*and*

CLATSOP COUNTY ASSESSOR,
*Intervenor.*

(TC 4689)

Bhagwati P. Poddar, Plaintiff (taxpayer) argued the cause *pro se.*

Rochelle A. Nedeau, Assistant Attorney General, Department of Justice, Salem, filed an Answer for Defendant (the department) but did not argue the cause.

Heather Reynolds, Clatsop County Counsel, Astoria, filed an Answer and argued the cause for Intervenor (the county).

Amended decision rendered September 22, 2005. ▮

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

This matter comes before the court for decision after trial. Bhagwati P. Poddar (taxpayer) appeared *pro se.* Intervenor Clatsop County Assessor (the county) was represented by counsel. Defendant Department of Revenue (the department) tendered its defense to the county and did not participate at trial.

## II. FACTS

Taxpayer and his spouse purchased a property in Clatsop County in 1974. That property initially consisted of a residence (the old house) and a number of other structures located on 9.5 acres. In 1993, the county split the original piece of property into two property tax accounts. The account containing the old house and the various other structures was a five-acre parcel (the property) zoned RA-5 in accordance with Clatsop County Land and Water Development and Use Ordinance Number 80-14 (Ordinance 80-14).[1] Pursuant to section 3.228 of Ordinance 80-14, only one family dwelling is permitted on a five-acre RA-5 parcel and, up until 1994, that one dwelling was the old house.

---

[1] The remaining 4.5 acres was retained in the original account and is not at issue in this appeal.

In 1992, taxpayer obtained from the county a land development permit to replace the old house with a newly constructed family dwelling. On that permit, an employee of the county indicated that "applicant agrees to remove exist-ing house[, *i.e.*, the old house,] with[in] 6 months (six) of occu-pancy of new house, or completion of new house, whichever is first." Taxpayer thereafter began construction on the replace-ment dwelling (the new house).

On July 19, 1993, Robert Legg (Legg), an appraiser for the county, visited the property, apparently to inspect and measure the new house for property tax valuation purposes. Taxpayer refused Legg access to the property and stated that when the new house was complete the county should remove the old house from the property tax rolls. Legg agreed that the county would honor that request once the old house had been destroyed. Legg and taxpayer then discussed the possi-bility of taxpayer selling the old house to the county for one dollar so the fire department could burn it down as part of a training exercise, plans that never came to fruition.

On June 6, 1994, taxpayer received a certificate of occupancy for the new house. After carpeting the interior of the new house, taxpayer moved into that residence on June 24, 1994. Legg then returned to the property on July 1, 1994, to inspect the new house. Taxpayer again refused Legg entry. The two continued their discussion, however, because tax-payer wanted the old house removed from the property tax rolls. Despite the fact that the old house still had functioning plumbing and heating, Legg assumed that the plumbing would be capped off in the next year because taxpayer would convert the old house into a storage structure. Indeed, on July 25, 1994, taxpayer wrote to the county advising them that the old house had "been converted to a storage building effective June 27, 1994." As a result, Legg reduced the value of the old house for the 1992-93 property tax year by $1,700 to reflect the assumption that taxpayer would cap the plumb-ing; that resulted in that reduction being trended forwarded for the 1994-95 and 1995-96 property tax years.[2]

---

[2] The parties dispute the values that the county assigned to the old house for the 1994-95 and 1995-96 property tax years. Under its analysis of this matter, how-ever, the court is not required to determine what those values actually were.

Taxpayer testified that his July 25, 1994, letter was a pretext designed to "buy some time" while he endeavored to demolish the old house.[3] In response to that letter, on August 18, 1994, an employee of the county wrote to taxpayer advising him that he was required to obtain a development permit for a storage building or completely remove the old house by September 30, 1994. Taxpayer did neither.

On May 13, 1996, Darlene Wisdom (Wisdom), an employee of the county, wrote a letter to taxpayer's spouse, who had first written the county in August 1994 and who later had met with Wisdom on May 10, 1996. In that letter, Wisdom laid out the process by which taxpayer could bring the old house into compliance with zoning rules. Wisdom stated in that letter that the process set out in the letter was to be done in lieu of taxpayer removing the home. Taxpayer again did neither and on June 21, 1996, the county ordered taxpayer to pay $7,500 for violation of the county's land use ordinances.

After Legg's visit to the property on July 1, 1994, taxpayer thereafter excluded county appraisal personnel from the property. In response to taxpayer's refusals to allow county appraisal personnel to inspect the new house, the county obtained from this court an order to inspect the property. That inspection occurred on January 22, 1997.[4] During that inspection, at least one of the county appraisers performed an inspection of the interior of the old house. That inspection did not result in any change in the roll value of the old house. The old house was later demolished to the satisfaction of the county, which then retroactively reduced the value of the property on the tax rolls for the 1996-97 property tax year to reflect the demolition of the old house.

---

[3] The record is unclear whether taxpayer ever capped off the plumbing as Legg had assumed taxpayer would do in order to convert the old house to a storage structure. The county has not alleged that taxpayer did not do that; therefore, the court is not required to address whether the old house should have a value higher than that listed on the property tax rolls after Legg's reduction.

[4] The inspectors also photographed the exterior of the old house on that date. On June 26, 1997, the old house was photographed again. The difference between those two dates is stark. In January the exterior of the old house appears nearly complete; in June, the old house is missing a portion of its roof and most of the siding material on at least on exterior wall.

Taxpayer initially appealed the 1994-95 and 1995-96 property tax years to the Magistrate Division, claiming that the old house should have no value for property taxation purposes for those years. The magistrate determined that taxpayer failed to meet his burden of proof and ruled in favor of the county. This appeal then ensued. The matter was held in abeyance for significant periods of time.

### III. ISSUE

Has taxpayer met his burden of proof necessary to reduce the value of the old house to zero for property taxation purposes for the 1994-95 and 1995-96 property tax years?

### IV. ANALYSIS

■ Taxpayer argues that under ORS 308.205 and ORS 308.235[5] the old house had no value for property taxation purposes for the tax years at issue because of governmental restrictions placed on the property by the county. Taxpayer appeals from a decision of a magistrate and, therefore, bears the burden of proof on appeal. ORS 305.427 (2003). The county asserts that taxpayer has not met that burden because the old house had some value for the property tax years at issue and that taxpayer has not shown a value for the property other than that determined by the county. The court agrees with the county.

In determining the real market value of the old house for the property tax years at issue, ORS 308.205 stated, in pertinent part:

> "(1)  Real market value of all property, real and personal, *as the property exists on the date of assessment*, means the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's-length transaction during the fiscal year.
>
> "(2)  * * *

---

[5] All references to Oregon Revised Statutes (ORS) are to the 1993 edition, unless otherwise indicated. Neither ORS 308.205 nor ORS 308.235 was amended for the period relevant to this appeal.

"(d)    *If the property is subject to governmental restriction* as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless *adjustments in value are made reflecting the effect of the restrictions.*"

(Emphasis added.) ORS 308.235(1)(a), which concerns that valuation of land, states that, "[t]axable real property shall be assessed by a method which takes into consideration * * * [t]he applicable land use plans, including current zoning and other governmental land use restrictions."

Based on those statutes, taxpayer argues that the evidence establishes, as a matter of law, that the old house had no value for property taxation purposes for the property tax years at issue. In particular, taxpayer points to Ordinance 80-14, which states, in part, that property zoned RA-5 may only have one family dwelling per five-acre parcel. In addition, taxpayer highlights the portion of the development permit for the new house that stated as a condition of approval that the old house be removed within six months of occupancy or completion of the new house. Taxpayer argues that on each date of assessment the ordinance and permit prevented him from legally using the old house as a family dwelling—a premise he buttresses with evidence that he was fined $7,500 for noncompliance with the requirements of the ordinance and land use permit—and, therefore, the old house had no value for property taxation purposes for each property tax year.

Before proceeding with further consideration of taxpayer's proposed analysis, the court pauses to observe the delicate and limited nature of taxpayer's theory. Taxpayer's basic premise is that the old house had no value for property taxation purposes for the years at issue because it could not be used legally *as a family dwelling*. Moreover, taxpayer has not provided evidence as to some value between zero and the assessed value for the old house should the court disagree with his premise. Essentially, therefore, taxpayer offers an "all or nothing" approach in which, if the court disagrees with his analysis, the court must decide in favor of the county.

With that in mind, the court proceeds with taxpayer's proposed analysis.

Taxpayer asserts that this case is factually indistinguishable from *Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970). In that case, the taxpayer was required to set aside open areas in a residential development. *Tualatin*, 256 Or at 325. The taxpayer constructed a golf course in those areas, but that golf course thereafter always operated at a loss. *Id.* at 325-26. At one point, the taxpayer unsuccessfully attempted to donate the golf course to King City, but the city refused the donation. *Id.* at 332. Based on the factual record in the case, the Oregon Supreme Court affirmed the tax court's determination that the land had no value for property taxation purposes. *Id.*

Although taxpayer in this case discussed a transfer of the old house to the county, the similarities with *Tualatin Development* end there. As the court stated in *Tualatin Development*:

> "[The taxpayer] cannot sell the land free of the zoning restrictions or put it to any use which would interfere with its function as 'open space.' The use of land as a golf course has been unprofitable and will probably continue to be so; *no profitable use of the land has been suggested.*"

*Id.* at 327 (emphasis added). Here the county provided or considered at least two alternative uses of the old house: use of the old house as a storage structure, and sale of the component parts of the old house coupled with its ultimate removal. Indeed, the facts of this case indicate that taxpayer wrote the county on July 25, 1994, out of a desire to have the county believe that he had converted the old house into a storage structure. He testified that he wrote that letter so that he could "buy some time" to sell off the component parts of the structure and to eventually remove the old house from the property. The county responded to that letter on August 18, 1994, informing taxpayer as to the steps he would need to take to bring the old house into compliance as a storage structure.[6]

---

[6] The issue of whether taxpayer would convert the old house to a storage structure persisted until at least mid-1996. On May 13, 1996, the county wrote a letter to taxpayer's spouse in which it outlined the steps necessary to make the

■      The record also indicates that Legg and taxpayer discussed the old house on July 1, 1994, and steps that could be taken to convert the use of that structure. Perhaps acting in response to feedback he received from taxpayer, Legg decreased the value of the old house based on the assumption that taxpayer would cap the plumbing during the 1994-95 property tax year. As taxpayer acknowledges, "[i]n determining the market value of restricted property the market will consider only those uses for which the property may be utilized." (Citing *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24, 30 (1994).) The record in this case indicates that Legg did exactly that; he reduced the value of the old house to take into account his belief that taxpayer would cap the plumbing in order to change the structure's intended use. That Legg did so based on taxpayer's apparent deception is lost on taxpayer. Also lost on taxpayer is the fact that taxpayer did not make the old house available to the county's appraisers during the property tax years at issue. Whatever further reductions in value the county might have made cannot now be known.

■      Taxpayer's next argument flows from that last statement. Taxpayer asserts that *Tualatin Development* stands for the proposition that speculation as to value in such circumstances is disfavored and, therefore, any consideration by the court as to the valuation of the old house as a storage structure would be error. Although the Supreme Court in that case stated that "[a]ssigning a money value to such a speculative possibility seems to us unnecessary; the figure could only be arrived at arbitrarily[,]" that statement characterized the preceding paragraph in which the court described how an out-of-state court had assigned a value to land encumbered by a trust. *Tualatin Development*, 256 Or at

conversion. At trial taxpayer asserted that he believed the letter had an implicit requirement that the old house eventually be removed *even if he had been successful in converting it to a storage structure.* Taxpayer's post-trial submission indicates that he apparently has abandoned that position. The court has reviewed the May 13, 1996, letter and finds that the document contains no such implicit requirement that the old house eventually be removed. The letter merely informed taxpayer that, in the event he did not convert the old house into a storage structure, the county would review his original development permit to ensure that he satisfied the condition of approval—*i.e.*, that he remove the old house as he had agreed to do at the time the development permit had been issued.

332. Again, this court directs taxpayer to the earlier language in *Tualatin Development* in which that court's analysis was predicated on the fact that "no profitable use of the [golf course had] been suggested." *Id.* at 327. The reasoning in *Tualatin Development* cannot properly be viewed as standing for a proposition that courts and appraisers cannot consider the valuation of property under different circumstances because the court in that case understood that no other circumstances existed for the golf course property; thus, the court could not have speculated in any event because it had determined that no alternative existed. Here this court has concluded, and taxpayer and the county appear to have understood, that at least one other legal option existed for taxpayer's use of the old house: it could have been converted into a storage building.[7]

■ Having concluded that an alternative use existed for the old house, the delicate nature of taxpayer's approach causes it to fall inward on itself. As this court has stated, "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the RMV of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citing *King v. Dept. of Rev.*, 12 OTR 491 (1993)). Having relied solely on his mistaken belief that the old house had no value for property taxation purposes because he could not legally use it as a family dwelling, taxpayer did not offer any evidence from which this court could conclude that the value of the old house was different from that assigned by the county. Thus, the court concludes that taxpayer failed to meet his burden of proof necessary to establish that the county's valuation was in error.

---

[7] Taxpayer's reading of *Tualatin Development* and his approach in general must fail when one considers ORS 308.205(2)(d), a statute upon which taxpayer relies. That statute requires a property's real market value to reflect the effect of government restrictions. If ORS 308.205(2)(d) expressly requires the value of a property to be adjusted to reflect the effect of government restrictions placed on it, how may one make such adjustments if one cannot consider other uses of the property? That is the work of an appraiser. In this case the county employed an appraiser to determine the value of the old house and that appraiser made an adjustment to the value of the old house based on taxpayer's pretextual assurance that it would be converted into a storage structure. Without appraisal evidence to the contrary submitted by taxpayer, the court's inquiry is at an end.

## V.  CONCLUSION

For the foregoing reasons, the court concludes that taxpayer failed to meet his burden to prove that the old house should have a value for property taxation purposes different from that assigned for the property tax years in question. Now, therefore,

IT IS THE DECISION OF THE COURT that the real market value for the property at issue in this matter shall remain undisturbed for the 1994-95 and 1995-96 property tax years.

Costs to the county.