IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MARK DAVIS )
and LEIGH ANNE RETTINGER, )
)
        Plaintiffs, ) TC-MD 130163N
)
      v. )
)
MULTNOMAH COUNTY ASSESSOR, )
)
        Defendant. ) **FINAL DECISION**

The court entered its Decision in the above-entitled matter on November 14, 2013. The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered. Plaintiffs' request for reconsideration, filed November 29,

2013, is denied under TCR-MD 17 B. The court's Final Decision incorporates its Decision

without change.

Plaintiffs appeal the real market value of property identified as Account R531842 for the

2012-13 tax year. A trial was held by telephone on September 16, 2013.[1] Mark Davis appeared

on behalf of Plaintiffs.[2] Gabriel White (White), Project Manager and Building Science

Consultant, Forensic Building Consultants (Forensic); Muneer Sean Gores (Gores), President,

Sean Gores Construction Inc.; and Jeffrey Millis, also with Sean Gores Construction Inc., each

testified on behalf of Plaintiffs. Jeff Brown, Residential Appeals Lead Appraiser, appeared on

behalf of Defendant. Barry Dayton (Dayton), Residential Appeals Lead Appraiser; Scarlet

Weigel (Weigel), Appraisal Supervisor; and Scott Carver (Carver), registered appraiser, each

testified on behalf of Defendant.

---

[1] The parties agreed to schedule a telephone trial during the case management conference held in this matter on May 15, 2013. Telephone trials are scheduled for three hours.

[2] Plaintiff Leigh Anne Rettinger also appeared at trial.

Plaintiffs' Exhibits 4-5, and 7-8 were admitted over Defendant's objections. Defendant objected to, and the court excluded, Plaintiffs' Exhibit 6 because it was not provided to Defendant within the time required by the court's Order, issued July 30, 2013. Defendant's Exhibit A was received without objection. Defendant's Exhibit E was admitted over Plaintiffs' objection.

## I. STATEMENT OF FACTS

The subject property is located in the residential Forest Park neighborhood west of downtown Portland. (Def's Ex A at 4.) Dayton described the neighborhood as "a unique 'rural like' suburban area with semi-rural to suburban aspects resulting in a diverse neighborhood with homes that range from quite 'in-the-woods' houses on standard to large subdivision type lots to estate type properties with exceptional views and multi-acreage sites." (*Id.*) Dayton reported that the subject property consists of a "main level" with "skylights, kitchen, bedroom suite, den, mud room, living room, and dining room," and a "finished lower level" with "two and a half bath[rooms]" and a "large wet bar[,]" a "[u]tility room[,]" "[t]wo bedrooms[,]" "[a] temperature controlled wine room[,]" a "family room[,]" and "a media room." (*Id.* at 4-5.) He described the subject property lot as "sloped lending itself well to the daylight lower level design to the subject improvements." (*Id.* at 4.)

Plaintiffs assert that, in November 2011, they "learned of major construction defects * * * that negatively impact the market value[]" of the subject property. (Ptfs' Compl at 3.) They report that, "[i]n November 2011, two of [their] windows started leaking. During forensic investigation of the window[] leaks [they] became aware of significant construction defects related to the building envelope of the property." (*Id.*)

/ / /

White testified that he inspected the subject property and assisted with preparation of the Preliminary Building Envelope Investigation report (preliminary report) dated December 19, 2011. (Ptfs' Ex 4.) The preliminary report states that, "[o]n November 30, 2011, [Forensic] performed a preliminary building envelope investigation * * * noting evidence of the following: 'Nonconforming' construction conditions (i.e., construction 'defects'); Water leakage-facilitating conditions and evident water leakage pathways; Resultant property damage (if any)." (*Id.* at 3.) Forensic's investigation methods included a review of documents, a review of "service history information," a "[v]isual review" of the subject property, and an "[i]nvasive investigation" of the subject property, in which Forensic "examined concealed building envelope assemblies at limited invasive opening (IO) locations at the [subject property]." (*Id.* at 4.)

"Forensic's investigation * * * identified multiple 'nonconforming' and water leakage-facilitating conditions at the [subject property], which individually and or in combination have resulted in property damage or have the potential to result in future property damage." (Ptfs' Ex 4 at 5.) White testified about specific " 'nonconforming' and water leakage-facilitating conditions" that either have or could result in damage to the subject property. (*See id.*) For example, he testified that he observed examples of improper installation of "fiber-cement siding," "manufactured stone veneer," "exterior wood trim," and "flange-mounted window[s]." (*Id.* at 28-33, 44-46.) White testified that he observed damage to building components from "sustained moisture absorption." (*Id.* at 55-56.) He testified that the "moisture content level" of the trim and wall sheathing at window locations in the subject property exceeded the 19 percent threshold above which water damage begins. (*See id.* at 51.) White testified that a typical home inspector would not be able to "analyze and evaluate" the concealed conditions within the subject property building envelope that Forensic identified.

The preliminary report identified "recommended next step[s]" including "[a]dditional invasive investigation * * * to examine additional invasive openings (IOs) at select locations through the [subject property's] building envelope assemblies." (Ptfs' Ex 4 at 18.) The preliminary report explained that "additional investigation is required to better verify the presence and extent of concealed conditions" and "to more effectively document and evaluate the condition, sequencing, and integration of concealed building envelope components and systems * * *." (*Id.*)

White testified that, after Forensic's investigation in December 2011, Forensic undertook additional investigations and found that the conditions affecting the subject property were "systemic." He testified that Forensic prepared a "preliminary scope of repair" report (scope of repair) dated May 10, 2013, that provided "a general outline of the steps necessary to remediate the 'nonconforming' conditions observed at the [subject property]." (Ptfs' Ex 7 at 1.) The scope of repair report includes several sketches of the subject property identifying "previous repair locations" and locations yet to be repaired. (*Id.* at 5.)

Gores testified that he created a proposed construction contract for the subject property, dated May 14, 2013, based on Forensic's scope of repair. (Ptfs' Ex 8.) The contract subtotal is $152,412 to which 15 percent profit and overhead and 10 percent contingency were added for a total contract price of $190,515. (*Id.* at 3.) Gores testified that the actual costs of repairs could be higher or lower because the full extent of the damage was unknown at the time the contract was drafted and cannot be determined until all of the subject property's siding is removed. He testified that it is more likely that the actual costs will be higher, not lower, than the contract estimate. Gores testified that, although the contract date was May 14, 2013, the costs as of January 1, 2012, would have been similar.

Plaintiffs provided a summary document listing "repair costs" for the subject "property damage." (Ptfs' Ex 5 at 1.) In addition to the estimated repair cost of $190,515 from Sean Gores Construction Inc., Plaintiffs reported "investigation" costs of $11,036.18; "emergency repairs (Nov. 11 - May 12)" of $34,049.30; and "forensic repair oversight" costs of $19,051.50, for "total repair costs for property damage" of $254,651.98. (Id.)

Weigel testified that, during Plaintiffs' appeal of the subject property's real market value for the 2009-10 tax year, Plaintiffs' provided an Initial Site Visit Report (initial report) from Forensic dated January 24, 2009. (Def's Ex E.) White testified that Forensic inspected the subject property in 2009 and a report was created following that inspection. He testified that, at that time, a water leak was observed above a door at the subject property. The initial report was prepared based on "an initial visual review of the exterior cladding and building envelope components at the [subject property] * * * on January 23, 2009." (Id. at 2.) Unlike the preliminary report, the initial report was not prepared based on "invasive techniques (removing section of siding, roofing, trim, etc.)[.]" (Id.) The initial report concluded that "Forensic observed multiple construction defects associated with the siding, stone veneer and open deck attachment at the [subject property]. [It] also found what may be evidence of moisture intrusion through the structure's envelope and observed potential resultant damage." (Id. at 13.)

Carver testified the Defendant recommended a reduction in the subject property's 2009-10 real market value at the board of property tax appeals based on the water intrusion problem identified by Plaintiffs. He testified that Plaintiffs identified additional damage of about $75,000 during their 2009-10 appeal to this court. Weigel and Carver testified that Defendant relied on Forensic's initial report and the additional damage identified by Plaintiffs in stipulating with Plaintiffs to a 2009-10 real market value for the subject property. (See Def's Ex F (Judgment of

Stipulation).) Carver testified that Defendant reduced the subject property's 2009-10 real market value by $378,740 from the roll value. Plaintiffs disagreed as to the basis for the subject property's 2009-10 stipulated value. (Ptfs' Compl at 3.) They asserted the stipulated value was based on Plaintiffs' January 28, 2009, purchase price of $800,000 for the subject property. (*Id.*) Dayton stated in his report that Plaintiffs' January 2009 purchase of the subject property was following foreclosure. (Def's Ex A at 6.)

Dayton testified he inspected the subject property and completed an appraisal report. (*See* Def's Ex A.) He testified that he found the subject property improvements to be of "good quality." (*See id.* at 4-5.) Dayton testified that none of the subject property's building envelope defects were observable at the time of inspection. He testified that he did not make any adjustments for the subject property's defects because, at the time of his inspection, he was told by "one of the owners that some work had been done to the rear of the home, but the owner was non-specific." (*Id.* at 5.) Dayton testified that no evidence of completed work was provided to Defendant. (*Id.*) He testified that the cost to cure evidence provided by Plaintiffs was too speculative for him to determine an adjustment.

Dayton testified that he used the sales comparison approach to determine the subject property's real market value as of January 1, 2012. (Def's Ex A at 7-9.) He identified four comparable sales and made adjustments for differences including time, view, room count, gross living area, finished basement size, and garage size. (*Id.* at 11-12.) The adjusted sale prices of Dayton's comparable sales ranged from $817,300 to $943,400. (*Id*. at 11-12.) He gave the most weight to his first two comparable sales, which were located nearest to the subject property. (*Id.* at 9, 11.) Dayton concluded a real market value as of January 1, 2012, of $850,000. (*Id.* at 9.)

/ / /

The subject property's 2012-13 tax roll real market value was $765,810 and its 2012-13 maximum assessed value was $757,860. (Ptfs' Compl at 2.) Plaintiffs request a 2012-13 real market value of $575,000 based on a "mortgage refinance" appraisal of the subject property for $900,000 on September 10, 2011, less $325,000 for "construction defects." (*Id.* at 4.) Defendant concluded the subject property's 2012-13 real market value was $850,000. (Def's Ex A at 10.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]t

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiffs did not use any of the three approaches of value recognized by OAR 150-308.205-(A)(2)(a). Plaintiffs' requested 2012-13 real market value is based on the subject property's value determined in a September 2011 "mortgage refinance" appraisal less the estimated cost to cure construction defects affecting the subject property and additional costs incurred by Plaintiffs.[4] Plaintiffs' provided a copy of the "mortgage refinance" appraisal with their exhibits, but Plaintiffs did not offer the appraisal as an exhibit at trial and the author of the appraisal was not available to testify at trial. (*See* Ptfs' Ex 3 (appraisal).) As a result, the court gives no weight to Plaintiffs' appraisal.

The majority of Plaintiffs' presentation at trial focused on construction defects affecting the subject property. White testified persuasively about Forensic's investigation and preliminary report detailing specific " 'nonconforming' and water leakage-facilitating conditions" affecting the subject property. Although the court is persuaded that, as of the January 1, 2012, assessment date the subject property required some repairs, the court cannot determine what repairs had occurred prior to January 1, 2012, and what repairs continued to be necessary as of January 1, 2012.

---

[4] In their list of "total damages" of $298,320, Plaintiffs include loss of use, prejudgment interest, and attorney fees and costs. (Ptfs' Ex 5 at 2.)

In their Complaint, Plaintiffs stated that two of the subject property's windows "started leaking" in November 2011 and, "[d]uring forensic investigation of the windows leaks, [Plaintiffs] became aware of significant construction defects * * *." (Ptfs' Compl at 3.) However, the evidence presented indicates that Plaintiffs were aware of defects as early as January 2009 and took some measures to cure defects between January 2009 and January 2012. Defendant provided an initial report from Forensic dated January 2009 describing some of the same problems as those identified in Forensic's December 2011 preliminary report. White testified that a water leak above a door at the subject property prompted the initial inspection in January 2009. Plaintiffs reported that they spent $34,049.30 on "emergency repairs" between November 2011 and May 2012. (Ptfs' Ex 5 at 1.) It is unclear if the "emergency repairs" resolved some of the conditions identified in Forensic's initial report or preliminary report.

Even if the court could determine what repairs were required as of January 1, 2012, and the cost of those repairs, the court would not be able to determine the subject property's real market value as of January 1, 2012, because Plaintiffs provided no evidence of the subject property's real market value after repairs. As discussed above, Plaintiffs assumed the subject property's 2012-13 real market value, absent any defects was $900,000, but failed to offer any evidence in support of that value. Plaintiffs' evidence is, therefore, inconclusive and Plaintiffs have failed to meet their burden of proof.

Even though the burden has not shifted under ORS 305.427, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Using the sales comparison approach, Dayton concluded that the subject property's real market value as of January 1, 2012, was $850,000. Dayton testified that he did not make any adjustments for the subject property's

defects because the defects were not observable at the time of his inspection and because he could not determine what repairs had been completed as of January 1, 2012. The court agrees with Dayton that Plaintiffs' evidence of required repairs as of January 1, 2012, is inconclusive. However, as stated above, the court finds that some repairs were required as of January 1, 2012. Because Dayton failed to make any cost to cure adjustment, the court is not persuaded by his conclusion that the subject property's real market value was $850,000.

III. CONCLUSION

After careful consideration, the court finds that Plaintiffs' failed to meet their burden of proof. The court is not persuaded that the subject property's 2012-13 real market value was $850,000, as determined by Defendant's appraiser. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of December 2013.

 

 

_____

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on December 3, 2013. The court filed and entered this document on December 3, 2013.*