IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JILL ANDERSON and JEFFREY GERRY,      )
                                      )
                 Plaintiffs,          )     TC-MD 130293N
                                      )
        v.                            )
                                      )
MULTNOMAH COUNTY ASSESSOR,            )
                                      )
                 Defendant.           )     **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 16, 2013.  The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered.  The court's Final Decision incorporates its Decision without

change.

Plaintiffs appealed the real market value of property identified as Account R287114

(subject property) for the 2010-11 through 2012-13 tax years.[1]  A trial was held in the Oregon

Tax Courtroom on November 14, 2013.  W. Scott Phinney, an Oregon licensed attorney,

appeared on behalf of Plaintiffs.  Mona St. Clair (St. Clair), a realtor specializing in residential

property testified on behalf of Plaintiffs.  Lindsay Kandra, Assistant County Counsel, appeared

on behalf of Defendant.  Barry Dayton (Dayton), Registered Appraiser specializing in residential

property, testified on behalf of Defendant.  Plaintiffs' Exhibits 1, 2 pages 2 through 13, and 3

were received without objection.  Defendant objected to Plaintiffs' Exhibit 2 page 1 because it

was prepared by Plaintiffs' counsel, not St. Clair, and the court excluded Plaintiffs' Exhibit 2

page 1.  Defendant's Exhibit A was received without objection.

/ / /

---

[1] Plaintiffs' appeal for the 2012-13 tax year is from an Order of the Board of Property Tax Appeals. Plaintiffs' appeal for the 2010-11 and 2011-12 tax years is under ORS 305.288(1) (2011).

I.  STATEMENT OF FACTS

The subject property is located in Troutdale, Oregon, along the Historic Columbia River Highway.  (Def's Ex A at 14.)  It is a 3,001-square foot,[2] two-story house built in 1920 located on a 1.62-acre lot backing to the Sandy River.  (*Id.*)  The subject property includes five bedrooms and three bathrooms.  (*Id.*)  It also includes a two-car garage, a 36 by 40-foot outbuilding with "separate storage and shop space," and a 13 by 20-foot storage building with a 7 by 7-foot pump house.  (*Id.* at 6, 14.)  Dayton wrote that the subject property has "private septic and [a] shared water well."  (*Id.* at 7.)

St. Clair and Dayton testified that they each inspected the subject property.  Dayton testified that he considered the subject property to be an "era property" - it includes features not found in newer homes.  He testified that both the subject property's quality of construction and its condition were "good."  (*See* Def's Ex A at 14.)  Dayton observed that the subject property's "kitchen appeared to have been remodeled within the last eight years" and included "hardwood flooring, all hardwood cabinets with solid granite counter tops, all stainless appliances, [and] stainless steel backsplash."  (*Id.* at 6.)  Dayton testified that the subject property's bathrooms appeared to have been updated.

St. Clair testified that the subject property received some "recent cosmetic upgrades" including new tiles in the bathrooms, a jetted tub, and a nice laundry and mud room.  She testified that the subject property had not been "renovated" or "restored."  St. Clair testified that she considers a "restored" home one that has been brought up to date.  She testified that a "remodel" involves the "structure" and "systems" of a property, including plumbing and wiring.  St. Clair testified that the subject property is like an "old pig with lipstick."

_____

[2] St. Clair's written evidence stated that the subject property is 2,915 square feet.  (*See, e.g.,* Ptfs' Ex 1 at 9.)  She testified at trial that was a typographical error; the subject property is 3,001 square feet.

St. Clair testified that, in her view, several "issues" with the subject property negatively affect its value. (*See* Ptfs' Ex 1 at 7.) She testified that the subject property's windows appeared to be the original 1920 windows; it is not insulated; it shares a driveway; it lacks air conditioning; it includes only one working fireplace; and it "requires extensive well maintenance." (*Id.*) St. Clair testified that she did not think the subject property's wiring had been updated, although she was not sure. Dayton disagreed with St. Clair that all of the subject property's windows were 1920 originals. He testified that he observed windows in bedrooms that had been updated.

St. Clair also testified regarding several "issues" with the subject property's location: it "lies in the 100 year floodplain and flooded in 1996"; it "is in a National Scenic Area which restricts its use"; and it is in a flight path. (Ptfs' Ex 1 at 7.) She testified that location in a National Scenic Area could be a detriment because it may impose restrictions on a buyer's ability to tear down the subject property and build a new house. St. Clair testified on cross-examination that there may be a pool of buyers specifically interested in scenic area properties.

A.      *Sales comparison approaches*

St. Clair testified that, in general, river-front homes are desirable. Dayton testified that the subject property appeals to a "niche market." St. Clair and Dayton both testified that they searched the Regional Multiple Listing Service (RMLS) for river-front homes that sold close to each of the three assessment dates at issue. St. Clair testified that she searched RMLS for sales in "Area 144," which includes Troutdale, Corbett, and Sandy. St. Clair testified that it was difficult to find sales because the market was slow.

/ / /

St. Clair testified that she completed a "bracket analysis" for each of the three tax years at issue. She testified that she did not make "specific," quantitative adjustments because those adjustment are "too subjective" and not truly based on market evidence. St. Clair testified that she relied on her experience and knowledge of buyer and seller expectations to determine a value range for the subject property for each of the three tax years at issue. (*See, e.g.,* Ptfs' Ex 1 at 9.)

Dayton testified that he tried to find comparable sales that would bracket the subject property in various respects. He testified that he wanted to avoid "across the board" adjustments (*e.g.*, all upward adjustments for one aspect of the properties). Dayton made adjustments for "design (style)"; "quality of construction"; condition; "room count"; "gross living area"; "functional utility"; "heating/cooling"; "garage/carport"; and "site amenities." (*See, e.g.*, Def's Ex A at 14.) Dayton made no adjustments for differences in lot size or for time because he could not identify market evidence from which to determine appropriate adjustments. Dayton testified that several of his sales were located in a floodplain, like the subject property: sale 1 for the 2010-11 tax year; sale 1 for the 2011-12 tax year; and sales 2 and 3 for the 2012-13 tax year. All of Dayton's comparable sales except for those on Interlachen Lane used septic systems like the subject property. (*Id.* at 8.)

Dayton testified that he viewed all of his comparable sales from the "curbside"; he did not view the interiors. (*See id.*) He testified that he was unable to verify any of his comparable sales with either the buyer or the seller. Dayton reported pending dates rather than closing dates for all of his comparable sales. He testified that all of his sales were closed sales, but the pending dates reflected the "meeting of minds."

/ / /

/ / /

1.      *2012-13 tax year*

For the 2012-13 tax year, the subject property's real market value was $548,220 and its maximum assessed value was $461,750.  (Def's Ex A at 4.)

St. Clair relied on three properties that sold in 2011 and 2012 with prices per square foot ranging from $100.71 to $124.46 and an average of $115.94.  (Ptfs' Ex 1 at 9.)  She determined that the average price of $115.94 per square foot indicated a value of $347,936 for the subject property.  (*Id.*)  St. Clair concluded a value range of $337,000 to $357,000 for the subject property for the 2012-13 tax year.  (*Id.*)  St. Clair's sale 1 was a 3,108-square foot home built in 1998 on a 1.78-acre lot with Columbia River Gorge views that sold for $313,000 in July 2011. (*Id.*)  She testified that sale 1 was "definitely superior" to the subject property.  St. Clair testified that sale 1 was a short sale, but she used it without making any adjustment because she did not consider it to be a distress sale.

St. Clair's sales 2 and 3 were also used by Dayton as sales 2 and 3 in his 2012-13 sales comparison approach.  (Ptfs' Ex 1 at 9; Def's Ex A at 17.)  Sale 2 was a 3,214-square foot house built in 1970 with a two-car garage located on 1.11 acres in Troutdate that sold for $400,000 in March 2012.  (Ptfs' Ex 1 at 9.)  Dayton noted that sale 2 was located 1.2 miles from the subject property.  (Def's Ex A at 17.)  He concluded an adjusted price of $484,000 for sale 2.  (*Id.*) Sale 3 was a 4,810-square foot house built in 1938 with a four-car garage located on 2.77 acres in Corbett with view of the Columbia River Gorge that sold for $590,000 in March 2012.  (Ptfs' Ex 1 at 9.)  St. Clair testified that sale 3 was remodeled and she considered it to be a "high indicator" of value.  Dayton determined an adjusted price of $487,000 for sale 3.  (Def's Ex A at 17.)

/ / /

Dayton gave "primary consideration" to his sale 1, a property that sold for $470,000 and for which he determined an adjusted sale price of $559,000.[3] (*See id.* at 12, 17.) He testified that he gave sale 1 primarily consideration due to "its location on the same stretch of road and backing to the Sandy River as the subject" property. (*Id.* at 12.) Dayton gave "strong secondary consideration" to sales 2 and 3. (*Id.*) He concluded a real market value of $520,000 for the subject property as of January 1, 2012. (*Id.* at 13.)

2.      *2011-12 tax year*

For the 2011-12 tax year, the subject property's real market value was $574,990 and its maximum assessed value was $448,310. (Def's Ex A at 4.)

St. Clair identified two properties that sold in 2011. (Ptfs' Ex 1 at 26.) Her first sale, in February 2011, was a 2,160-square foot house on a 2.17-acre lot that sold for $372,325, or $172.37 per square foot. (*Id.*) St. Clair testified that sale 2 was a ranch home with a daylight basement on 1.78 acres. (*See id.*) Her second sale was the same sale that she identified as sale 1 in her 2012-13 analysis. (*Id.*) St. Clair testified that neither of her two sales were great comparable sales, but they were the best she could find for the 2011-12 tax year. The average price per square foot of her two sales was $136.54, indicating a value of $409,757 for the subject property. (*Id.*) St. Clair concluded a value range of $345,000 to $365,000 for the subject property. (*Id.*)

St. Clair's sale 1 was also used by Dayton as his comparable sale 1 for the 2011-12 tax year. (Def's Ex A at 15.) He concluded an adjusted sale price of $505,000 for that sale. (*Id.*) Dayton noted that "[t]he 'curb appeal' and overall appearance of quality of construction both

---

[3] Dayton acknowledged at trial that RMLS indicated sale 1 included a second garage. (*See* Ptfs' Ex 3 at 8; Def's Ex A at 17.) He testified it was an "oversight" to make a garage adjustment. (*See id.*) Dayton initially concluded an adjusted price of $569,000 for sale 1. (Def's Ex A at 17.) The adjusted price of sale 1 is $559,000 if the garage adjustment of $10,000 is removed. (*See id.*)

looked inferior to that of the subject" property. (*Id.* at 9.) Dayton testified that he placed primary weight on his sales 1, 4, and 5 for the 2011-12 tax year. Dayton's sale 4 for the 2011-12 tax year was the same as his sale 3 for the 2012-13 tax year, for which he concluded an adjusted price of $487,000. (*Id.* at 16.) Dayton's sale 5 was a 3,367-square foot house built in 1992 on a 1.83-acre lot that sold for $560,000 in December 2009.[4] (*Id.*) He concluded an adjusted sale price of $521,000 for that sale. (*Id.*) Dayton concluded the subject property's real market value was $510,000 for the 2011-12 tax year. (*Id.* at 13.)

3. *2010-11 tax year*

For the 2010-11 tax year, the subject property's real market value was $639,400 and its maximum assessed value was $435,260. (Def's Ex A at 4.)

St. Clair identified five properties that sold between July and December 2009 with prices per square foot ranging from $109.35 to $171.30 and an average of $147.39. (Ptfs' Ex 1 at 30.) A price of $147.39 per square foot indicates a value of $442,317 for the subject property. (*Id.*) St. Clair concluded a value range of $420,000 to $440,000 for the subject property. (*Id.*)

St. Clair's sale 1 was a 2,373-square foot house built in 1950 with a one-car garage located on 1.93 acres in Corbett that sold for $320,000 in July 2009. (Ptfs' Ex 1 at 30.) She testified that it had a "peek-a-boo" view of the river and she considered it to be a low indicator of value. St. Clair's sale 2 was a 3,100-square foot house built in 1964 with a two-car garage located on 2.98 acres in Sandy that sold for $339,000 in September 2009. (*Id.*) She testified that sale 2 was a remodeled property with "sweeping river views." St. Clair's sale 3 was a 2,160-square foot house built in 1973 with a two-car garage located on 1.07 acres in Sandy that sold for $370,000 in October 2009. (*Id.*) She testified that sale 3 was a river-front property on

---

[4] Dayton reported the pending date as October 12, 2009. (Def's Ex A at 14.) The sale closed December 4, 2009. (*See* Ptfs' Ex 1 at 30; Ptfs' Ex 3 at 2.)

public water with new windows and a shop. St. Clair's sale 4 was a 3,367-square foot house built in 1992 with a 2-car garage located on 1.83 acres in Sandy that sold for $560,000 in December 2009. (*Id.*) She testified that sale 4 was a remodeled property on the Sandy river and she considered it to be a high indicator of value. St. Clair's sale 5 was a 4,642-square foot house built in 1935 with no garage located on 2.57 acres in Corbett with Columbia River Gorge views that sold for $720,000 in August 2009. (*Id.*) She testified that sale 5 had been "taken to the studs" and remodeled to add insulation and update the wiring, plumbing, and windows. St. Clair testified that sale 5 was "rehab[ilitated] to the period" and was a high indicator of value.

St. Clair's sale 4 was used by Dayton as his sale 2. (Ptfs' Ex 1 at 30; Def's Ex A at 14, 16.) Dayton made a $30,000 downward adjustment to his sale 2 for its superior "functional utility."[5] (Def's Ex A at 14.) He testified that the "functional utility" adjustment reflected the superior floor plan and layout of a house built in 1992 as compared with one built in 1920.[6] Dayton concluded an adjusted price of $521,000 for sale 2. (*Id.*) Dayton's sale 1 was a 2,924-square foot house built in 1933 with a one-car garage located on 9.16 acres in Corbett that sold for $500,000 in March 2010. (Def's Ex A at 14; Ptfs' Ex 3 at 1.) Dayton testified that sale 1 had a similar size and river front location as the subject property. Dayton made upward adjustments of $4,620 for gross living area; $10,000 for the garage; and $10,000 for the "inferior" outbuilding, but did not make any adjustment for the site size. (Def's Ex A at 14.) He

///

---

[5] Plaintiffs questioned why Dayton did not make a $30,000 "functional utility" adjustment to his sale 5 for the 2011-12 tax year, which is the same sale as his sale 2 for the 2010-11 tax year. Dayton testified that he made the same $30,000 adjustment to sale 5 for the 2011-12 tax year, but he listed it under the "quality of construction" category. (*See* Def's Ex A at 16.)

[6] Dayton stated in his report that one of the subject property's "bedroom[s] on the main level ha[ve] a slight functional matter as the traffic pattern requires using the utility room to enter the bedroom; however, this can also be deemed a room for domestic help habitation with no negative market reaction that can be measured. As the home has three to four other bedrooms no functional adjustment is deemed measurable." (Def's Ex A at 6.)

concluded an adjusted price of $525,000 for sale 1. (*Id.*) Plaintiffs provided an RMLS print-out for Dayton's sale 1 listing the total square feet as 3,302. (Ptfs' Ex 3 at 1.)

Dayton's sale 3 was a 1,483-square foot house built in 1962 with 520 square feet of finished basement and a two-car garage located on 0.13 acres on Interlachen Lane in Fairview that sold for $440,000 in August 2009. (Def's Ex A at 14; Ptfs' Ex 3 at 3.) Dayton testified that properties located on Interlachen have "community water" and "public sewer," unlike the subject property. He concluded and adjusted price of $518,000 for sale 3. (Def's Ex A at 14.) Dayton "favor[ed]" his sales 1 and 2, but gave sale 1 "strong primary consideration" and gave sales 2 and 3 "secondary consideration." (*Id.* at 11.) He concluded the subject property's 2010-11 real market value was $522,000. (*Id.* at 13.)

B.    *Market trends*

St. Clair testified that she reviewed RMLS Market Action reports from 2010 through 2013 to ensure that her real market value conclusions made sense in light of market trends. (*See generally* Ptfs' Ex 2.) She testified that the market action reports were "not specifically reflected" in her sales comparison approach; she used them only as a check on her analysis. St. Clair testified that the market trend in "Area 144" was downward 14.0 percent between January 2009 and January 2010; downward 4.6 percent between January 2010 and January 2011; downward 7.1 percent between January 2011 and January 2012; and downward 0.2 percent between January 2012 and January 2013. (Ptfs' Ex 2 at 3, 6, 9, 12.) St. Clair testified that January 2012 was the low point for the tax years at issue. (*Id.* at 13.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 through 2012-13 tax years. "Real market value is the standard used throughout the ad valorem

statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2010-11 tax year was January 1, 2010; the assessment date for the 2011-12 tax year was January 1, 2011; and the assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Here, both parties relied on the sales comparison approach.

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3.

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the

sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c)."

OAR 150-308.205-(A)(2)(c).

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.  *2012-13 tax year*

For the 2012-13 tax year, St. Clair concluded the subject property's real market value was in the range of $337,000 to $357,000 based on three sales. St. Clair's first sale was a short sale, but she did not make any adjustment for that "nontypical market condition" as required under OAR 150-308.205-(A)(2)(c). St. Clair's sale 1 was a much newer property than her other two sales and St. Clair testified that sale 1 was "definitely superior" to the subject property. Yet, the price per square foot of St. Clair's sale 1 was $22 to $24 per square foot less than her other two sales. The evidence indicates that St. Clair's sale 1 does not provide a reliable indicator of the subject property's real market value absent an adjustment for the nontypical market condition.

St. Clair's other two sales were also used by Dayton. St. Clair did not make adjustments to either of those sales, as contemplated by OAR 150-308.205-(A)(2)(c). Dayton made

adjustments for differences and determined adjusted prices of $484,000 and $487,000. The court finds that Dayton's adjustments were reasonable and accepts his adjusted values.

Dayton concluded a 2012-13 real market value of $520,000 for the subject property based on his determination that sale 1 would be given "primary consideration" with "strong secondary consideration" to sales 2 and 3. The court is not persuaded that Dayton's sale 1 should be given more weight than sales 2 and 3. As Dayton noted, his sale 1 was the least comparable with respect to the sale date; it was pending on June 29, 2012. (Def's Ex A at 12, 17.) Dayton's sale 2, located 1.2 miles from the subject property, was located closest to the subject property and sale 3 required the smallest net adjustment. The court finds that the comparable sales indicate a real market value of $500,000 for the subject property as of January 1, 2012.

B.      *2011-12 tax year*

For the 2011-12 tax year, St. Clair relied on only two sales, one of which was the short sale that she used for the 2012-13 tax year. As in her 2012-13 analysis, St. Clair did not make any adjustment for that "nontypical market condition" as required under OAR 150-308.205-(A)(2)(c). The unadjusted price of St. Clair's sale 1, $172.37 per square foot, indicates a real market value of $502,460, rounded, for the subject property. Dayton also used that sale in his analysis for the 2011-12 tax year and concluded an adjusted sale price of $505,000 for the sale.

Although the average price of St. Clair's two 2011-12 sales was $136.54 per square foot, indicating a value of $409,757 for the subject property, she determined that a real market value in range of $345,000 to $365,000 was appropriate. It is unclear on what basis she made that determination. The court finds no evidence to support St. Clair's real market value conclusion for the 2011-12 tax year. By contrast, the Dayton's conclusion that the subject property's real

/ / /

market value was $510,000 for the 2011-12 tax year is supported by the adjusted prices of his three best comparable sales, which ranged from $487,000 to $521,000.

C.      *2010-11 tax year*

St. Clair relied on five sales in her analysis for the 2010-11 tax year, with unadjusted prices per square foot ranging from $109.35 to $171.30. Those unadjusted prices indicate a range of $328,160 to $514,071, rounded, for the subject property. Although the average price per square foot, $147.39, indicated a value of $442,317 for the subject property, St. Clair concluded a real market value range of $420,000 to $440,000 for the subject property. As with her analyses for the 2012-13 and 2011-12 tax years, St. Clair made no adjustments to any of her sales. Dayton concluded a real market value of $522,000, based primarily on two sales for which he concluded adjusted sale prices of $525,000 and $521,000, respectively. He gave secondary consideration to his sale 3, with an adjusted price of $518,000. Plaintiffs provided a RMLS print-out for Dayton's sale 1 that states total square feet of 3,302, indicating the appropriate gross living area adjustment should have been downward $18,060 for a revised adjusted price of $501,940 for sale 1. The court finds that the evidence supports a real market value of $515,000 for the subject property as of January 1, 2010.

D.      *Requirements of ORS 305.288(1) and ORS 305.275(1)(a)*

Plaintiffs appeal the subject property's real market value for the 2010-11 and 2011-12 tax years under ORS 305.288(1), which states in pertinent part:

"The tax court shall order a change or correction applicable to a separate assessment of property to the assessment and tax roll for the current tax year or for either of the two tax years immediately preceding the current tax year, or for any or all of those tax years, if all of the following conditions exist:

"(a) For the tax year to which the change or correction is applicable, the property was or is used primarily as a dwelling (or is vacant) and was and

is a single-family dwelling, a multifamily dwelling of not more than four units, a condominium unit, a manufactured structure or a floating home.

"(b) The change or correction requested is a change in value for the property for the tax year and it is asserted in the request and determined by the tax court that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent."

As discussed above, the court found that the subject property's real market value was $515,000 for the 2010-11 tax year and $510,000 for the 2011-12 tax year. The differences between those real market value conclusions and the real market values on the assessment and tax rolls are not equal to or greater than 20 percent for either the 2010-11 or 2011-12 tax years. As a result, the court has no authority to order a change for either tax year.

For the court to order a change in real market value to the tax roll, Plaintiffs must be aggrieved. ORS 305.275(1)(a). "In requiring that taxpayers be 'aggrieved' under ORS 305.275, the legislature intended that the taxpayer have an immediate claim of wrong." *Kaady v. Dept. of Rev.*, 15 OTR 124, 125 (2000). This court has consistently interpreted ORS 305.275(1)(a) to require that a taxpayer's requested relief result in tax savings to the taxpayer. *See Parks Westsac L.L.C. v. Dept. of Rev.*, 15 OTR 50, 52 (1999). The 2012-13 maximum assessed value of the subject property was $461,750, and the court did not receive evidence as to whether a reduction in the real market value to $500,000 would result in tax savings to Plaintiffs.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the subject property's real market value was $515,000 for the 2010-11 tax year; $510,000 for the 2011-12 tax year; and $500,000 for the 2012-13 tax year. The court lacks authority under ORS 305.288(1) to order a change to the assessment and tax rolls for the 2010-11 and 2011-12 tax years. Plaintiffs' appeals for the 2010-11 and 2011-12 tax years must be dismissed. The

court did not receive evidence as to whether a reduction in the subject property's 2012-13 real market value to $500,000 would result in tax savings to Plaintiffs. The 2012-13 assessment and tax roll will be adjusted only if Plaintiffs are aggrieved under ORS 305.275(1)(a). Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' 2010-11 and 2011-12 appeals of property identified as Account R287114 are dismissed.

IT IS FURTHER DECIDED that the 2012-13 real market value of property identified as Account R287114 was $500,000. The assessment and tax roll will be adjusted only if Plaintiffs are aggrieved under ORS 305.275(1)(a).

Dated this ＿＿ day of January 2014.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on January 7, 2014. The Court filed and entered this document on January 7, 2014.*