IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

RENZO 11, LLC,                          )
                                        )
            Plaintiff,                  )    TC-MD 130076D
                                        )
      v.                                )
                                        )
CLACKAMAS COUNTY ASSESSOR,              )
                                        )
            Defendant.                  )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on November 14, 2013. The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

Plaintiff appeals the 2012-13 real market value of eight unimproved lots identified as

Accounts 05011749, 05011750, 05011751, 05011752, 05011790, 05011791, 05011792, and

05011793 (subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon on

September 11, 2013. Bradley Holcom (Holcom), Broker, appeared and testified on behalf of

Plaintiff. Darren Harper (Harper), Appraiser, testified on behalf of Plaintiff. Richard Valasek

(Valasek), Registered Appraiser, appeared on behalf of Defendant.

Plaintiff's Exhibits 1 through 9 and Defendant's Exhibit A were admitted without

objection.

## I. STATEMENT OF FACTS

The parties agreed that the subject property is located in the Yorkfield residential

subdivision in Canby, Oregon. Valasek described the subject property as "4 pairs of vacant lots

designed for attached townhouses." (Def's Ex A at 3.) The parties agreed that as of the

assessment date, the real market value of each lot is the same without regard to size and location. In his appraisal report, Valasek stated that "[e]arly in 2011, the construction lender foreclosed on the remaining 24 vacant lots and since that time the lots have been sold in groups of 2 to 12 to builders and investors in order to liquidate the inventory." (*Id.*) Holcom testified that Plaintiff purchased the subject property from Sterling Bank, paying $12,500 per lot and subsequently sold four lots located "close to the railroad tracks" for $19,000 per lot to "get rid of debt."

Holcom testified that "two of the eight lots" were sold to "Crisp [Homes, Inc.], a builder" for $25,500" each or $51,000 in July 2013. (*See* Ptf's Ex 4 at 1.) He testified that "two lots are committed" to close in November 2013, for "$23,900" each or $47,800. (*See* Ptf's Ex 5.) Holcom submitted a listing history for one of the two lots that are "committed," showing a listing price of $35,000 as of February 2013, and a reduction to $28,500 as of May 2013. (*See* Ptf's Ex 6.) Holcom testified that the subject property will "only allow 18' wide townhomes."

Harper, who lives in Canby and has been an appraiser for 20 years, testified that he relied on the sales comparison approach to determine the subject property's real market value. (*See* Ptf's Ex 3.) He testified that he selected three "single family lot sales" and three "bulk sales." Harper testified that he used a "shotgun approach," stating that "you get as much data as you can" to "bracket" the assessment date and "strengthen the appraisal." He testified that comparable properties 1 and 4 are "very identical" to the subject property. Harper testified that comparable property 1 is located one block away from the subject property and is "superior in size" and adjusted 10 percent for "its multi parcel transaction." (Ptf's Ex 3 at 2.) Harper admitted that comparable property 4 was "listed for seven days" before it sold and that the "average market time is much higher." Harper testified that the "seller" was "Cheaspeake Holding" and the seller could be a "lender." In response to questions, Harper testified that "bank

sales are strange animals" and the sale "could or could not be a distressed sale, depending on the motivation." Harper's appraisal report adjusted the reported sale prices from 5.2 percent to 66.1 percent. (*Id*. at 1-2.) Harper acknowledged that the "higher the adjustment percentage, the reliability goes down." The indicated values ranged from $20,300 to $25,300. (*Id*. at 1-2.) Harper stated that "[a] concluded value for the subject of $25,000 is well supported." (*Id*. at 2.)

In response to Valasek's questions, Harper testified that comparable properties 1, 3 and 5 were "multiple lot transactions" and acknowledged that the 10 percent discount for a "bulk sale" was a "peer number" developed from experience and training. Holcom testified that if the "discount" was increased to 20 percent, the "value per lot" would be "$27,000." (Ptf's Ex 2.) The parties discussed the appropriate bulk sale discount and whether the discount could be more than 30 percent. Harper agreed with Valasek that comparable properties 2, 4 and 6 "permit single family detached homes" to be built but did not know if Valasek was correct concluding that "townhouses" cannot be built on those lots.

Valasek testified he considered the "three approaches to value," concluding that "[o]nly the Cost/Land Abstraction approach is felt to be applicable." (Def's Ex A at 14.) He testified that "[w]ithout a market-supported adjustment for any discount of buying in multiples, the sales comparison approach becomes a less than reliable method if used to arrive at an estimate of value." (*Id*. at 13.) He testified that he relied on the "Land Residual Approach to Value," stating that "[i]t may be a less desirable approach than the sale comparison method, but is best used when there is a lack of reliable sales data[.]" (*Id*.) Valasek testified that "[n]o individual lot sales were found in Clackamas county or in the greater Portland metro area, near or even reasonably near, the assessment date," and that "[i]n a plat designed for attached townhouse development, a single lot sale almost never happens." (*Id*.)

To determine the subject property's real market value, Valasek testified that he relied on the "sale of four recently completed attached townhouses from the subject's subdivision." (*See id.* at 4.) Valasek described his process as follows:

> "The homes were completed early in 2012 with all four sales occurring later that year. RMV [real market value] for the improvements was estimated using the Department of Revenue cost factor book. No depreciation was included as the houses were new. Sales [sale prices] were adjusted to the assessment date using the Assessor's Ratio Study, certified by the Department of Revenue. The analysis indicates land values between $44,036 and $50,256, with an average of approximately $47,000.
>
> * * * * *
>
> "The Assessor's Ratio Study indicated a positive 4% annual adjustment for the subjects' (*sic*) neighborhood. Each sale was adjusted based on full months back to the assessment date."

(*Id.* at 13-14.) In response to questions, Valasek acknowledged that both of the 18' wide townhouse lots had indicated land values in excess of one of the 20' wide townhouse lots. (*See id.* at 4.)

Holcom critiqued Valasek's use of the "extraction method," asking Valasek why he did not use a "larger sample as recommended by the DOR [Department of Revenue]." (*See* Ptf's Ex 9 at 2.) Valasek responded that the four completed townhouses located in the same subdivision as the subject property were the "best examples" because "no depreciation deduction was required, making those sales more credible." He testified that he did not inspect the townhouses. Valasek testified that he relied on the Department of Revenue's cost factor book to determine real market value of the improvements and the on-site development costs were based on "county study by neighborhood." He acknowledged that the county's study and Department of Revenue cost factor data was not included in his report, only amounts stated on each tax account record. (Def's Ex A at 5-12.)

/ / /

## II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2012. ORS 308.007; ORS 308.210. [1] In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). "Real market value * * * shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 305.205(2).

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (Jul 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is

---

[1] All references to the Oregon Revised Statutes (ORS) and the Oregon Administrative rules (OAR) are to the 2011 version.

insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*), 310 Or 260, 265, 798 P2d 235 (1990).

There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

Plaintiff relied on the sales comparison approach. Harper identified six unimproved lots as similar to the subject property. Three of the six unimproved lots were approved for single family dwellings. There is no evidence that two townhomes sharing a common wall can legally be built on less than two contiguous lots. Valasek described the subject property as "4 pairs of vacant lots designed for attached townhouses." (Def's Ex A at 3.) The comparability of single family lots to the subject property is inconclusive.

Harper's three other comparable properties were allocated a portion of a bulk sale price based on the number of lots sold. Harper's Comparable No. 1 is "located along the same street as subject with adjustments applied for its slightly larger site area and for its multi parcel transaction (applied at 10% adjusting for a bulk purchase)" which closed two months prior to the assessment date. (Ptf's Ex 3 at 2.) Like the subject property, Comparable No. 1 was ultimately improved with two attached townhomes. Holcom conceded that a 20 percent adjustment could be applied for the bulk purchase, resulting in a requested real market value of $27,000 per lot. The parties acknowledged that the bulk purchase adjustment could be more than 20 percent. In

support of its requested real market value, Plaintiff submitted evidence of a July 2013 sale to Crisp Homes, Inc. and a real estate sale agreement for two additional lots to close in November 2013. The sale prices of the July 2013 transaction, and the November 2013 contract transaction, range from $23,900 to $25,500. Even though the July 2013 transaction occurred after the assessment date and the November 2013 contract transaction has not closed, those transactions, as do Plaintiff's two other comparable property sales, bracket the adjusted sale price of Comparable No. 1.

Defendant's determination of real market value relies on the extraction method. The extraction method uses a combination of actual sales data and tax roll values to estimate land value. This court has previously noted the Oregon Department of Revenue's warning that "[t]he extraction method is less reliable than the direct comparison approach and should be used with caution." *Coos County Assessor v. Smith*, TC-MD No 040520D, WL 2055955 at *10 (Aug 19, 2005) (citing Oregon Department of Revenue, 1993 Appraisal Methods for Real Property at 1). The method should be used with a large sample of properties within the same neighborhood to give a reliable range of values. (Ptf's Ex 9 at 3, Oregon Department of Revenue, Appraisal Methods for Real Property, revised July 2003.) Defendant relied on a narrow sample, selecting four comparable properties, within the same neighborhood. The *Appraisal of Real Estate* concludes that the extraction method is "applicable when the building's contribution to total property value is generally small and relatively easy to identify" and is "most effective when the improvements contribute little to the total sale price of the property." (Ptf's Ex 8 at 1 (citing Appraisal Institute, *The Appraisal of Real Estate* 335-336 (12th ed 2001)).) The improvement value of each of the four comparable properties selected by Valasek in relation to total adjusted sale price ranged from between 63.4 percent to 67.7 percent. The improvement value of each

comparable property which was the tax roll value contributed substantially to the total adjusted sales price. In the case before the court, the effectiveness of the extraction method is questionable and generally not applicable to the subject property. Sale transactions do not support Defendant's determination. The court concludes that Defendant's extraction method is not a reliable indicator of the subject property's real market value as of the assessment date.

## III. CONCLUSION

After careful consideration of the testimony and evidence, the court finds that the best evidence of the subject property's real market value was offered by Plaintiff as adjusted for bulk purchase transactions. The court concludes that the 2012-13 real market value of each of the eight unimproved lots was $30,000 or $240,000 for the subject property. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2012-13 real market value of eight unimproved lots identified as Accounts 05011749, 05011750, 05011751, 05011752, 05011790, 05011791, 05011792, and 05011793 (subject property) is $240,000.

Dated this ___ day of December 2013.

JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This Final Decision was signed by Presiding Magistrate Jill A. Tanner on December 3, 2013. The Court filed and entered this Final Decision on December 3, 2013.*