IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KATHERINE J. MACKEY,          )
          )
        Plaintiff,          )   TC-MD 130348N
          )
     v.          )
          )
DOUGLAS COUNTY ASSESSOR,        )
          )
        Defendant.       )   **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 17, 2013. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff appealed the real market value of property identified as Account R47338 (subject property) for the 2010-11 and 2011-12 tax years under ORS 305.288(1).[1] A trial was held by telephone on November 4, 2013.[2] Roger A. Hartman (Hartman), power of attorney, appeared and testified on behalf of Plaintiff. Mike Zerbach (Zerbach), general contractor; Patrice Glasscock (Glasscock), real estate broker; and Steve Gerlt (Gerlt), registered appraiser; also testified on behalf of Plaintiff. Paul E. Meyer (Meyer), Douglas County Counsel, appeared on behalf of Defendant. Amy M. Peters (Peters), Registered Property Appraiser I, testified on behalf of Defendant.

/ / /

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2009. Although the 2011 ORS are applicable for the 2011-12 tax year, there is no material difference between the 2009 and 2011 versions of the ORS sections cited in this decision.

[2] The parties agreed to schedule a telephone trial during the case management conference held in this matter on June 12, 2013. Telephone trials are scheduled for three hours.

Plaintiff's Exhibits 1, 3, and 4 and Defendant's Exhibit A were received without objection. Plaintiff's Exhibit 2 was received over Defendant's objection that the exhibit should have been exchanged prior to the exhibit exchange deadlines under Tax Court Rule-Magistrate Division (TCR-MD) 10 C(1). Plaintiff's Rebuttal Exhibit was allowed over Defendant's objection that the Rebuttal Exhibit was not exchanged within the exhibit exchange deadlines under TCR-MD 10 C(1).[3] Defendant raised a continued objection based on the timeliness of Plaintiff's Rebuttal Exhibit and requested that the court explain in writing its reasoning to allow the Rebuttal Exhibit.

Under TCR-MD 10 C(1), exhibits must be "postmarked at least 14 days before the trial date or physically received at least 10 days before the trial date." The Magistrate Division rules make no reference to rebuttal exhibits. The Preface to the Magistrate Division rules states, in part, that "[i]f circumstances arise that are not covered by a Magistrate Division rule, rules of the Regular Division of the Tax Court may be used as a guide to the extent relevant." TCR 56 B requires the exchange of exhibits prior to trial and identifies the time of exchange. TCR 56 B(3)(c), under "exceptions" to the exchange rule, states that "[d]ocuments submitted as rebuttal evidence only do not need to be exchanged." The court concludes that, to the extent Plaintiff's Rebuttal Exhibit was provided for the purpose of rebuttal, it is not subject to the exhibit exchange deadlines set forth in TCR-MD 10 C(1).

## I. STATEMENT OF FACTS

The subject property is a 1,404-square foot detached, single family residence built in 1950 and situated on a 0.37-acre lot. (Ptf's Ex 3 at 1; Def's Ex A at 2.) The subject property includes "three bedrooms, two full bathrooms,* * * [and a] kitchen [with] extra cabinetry/built-

---

[3] Plaintiff's Rebuttal Exhibit was filed with the court and served on Defendant on November 1, 2013.

ins, a pantry[,] and newer appliances." (Def's Ex A at 2.) It also includes a 576-square foot "attached unfinished garage/storage area * * * [and] a small shed * * * of no value." (*Id.*) The subject property is located in an unincorporated area near Roseburg "commonly referred to as the Green area." (*Id.* at 2-3.)

Hartman, Gerlt, Zerbach, and Glasscock each testified that they inspected the subject property and observed its condition. Hartman provided photographs of the subject property that he took in January and October 2013. (Ptf's Ex 1 at 1-6.) He testified that the subject property lacked any landscaping. (*See id.* at 1, 4.) Hartman testified that there was rot above the sliding glass door and mold on the cedar siding. (*Id.* at 3, 5.) He testified that the subject property was supported by wooden beams; it lacked a concrete foundation. (*Id.* at 5.)

Zerbach testified that the mold appearing on the subject property's walls indicated that the ventilation was inadequate and moisture was accumulating. (*See* Ptf's Ex 1 at 5.) He testified that the subject property's floors were "wavy" and "spongy" with many "soft spots." (*See* Ptf's Ex 2 at 1.) Zerbach testified that it would cost "approximately $35,000 to $40,000 to lift the subject property's house and install a foundation." (*Id.*) He testified that he observed rotten spots in the bathroom floor, requiring a complete bathroom remodel at an estimated cost of $10,000 to $15,000. (*Id.*) Zerbach testified that the subject property's ceiling was sagging and was as low as seven feet in some places. (*See id.*) In Zerbach's opinion, the subject property's "trusses [should] be replaced with engineered trusses." (*Id.*) He testified that the subject property's repairs would cost $100,000 or more, whereas a new, class 3 home could be built for $68 per square foot. Gerlt testified that, in his opinion, it was not financially feasible to repair the subject property.

/ / /

Hartman testified that the subject property's ceiling was asbestos. (Ptf's Ex 1 at 6.) Zerbach testified that the estimated cost to remove asbestos from the subject property is $8,618. (Ptf's Ex 2 at 5.) Peters and Zerbach both testified that asbestos ceilings were common in homes built in the 1950s and 1960s.

Peters testified that she toured the subject property in January and August 2013 and also provided photographs. (Def's Ex A at 6-10.) Peters determined that the subject property is "in fair condition with some deferred maintenance needing attention." (*Id.* at 3.) She stated that Plaintiff "reported that [the subject property's] roof is fairly recent and does not leak." (*Id.*)

A.    *Plaintiff's value evidence*

Glasscock testified that she viewed the subject property in April 2012 and, in her view, the subject property was not salable in its condition and the only value was attributable to the land. (*See* Ptf's Ex 3 at 1.) Glasscock testified that she completed comparative market analyses for the subject property for the 2010-11 and 2011-12 tax years. (Ptf's Ex 3.) She testified that she researched sales in the Regional Multiple Listing Service (RMLS) and in Defendant's records, but did not contact any of the buyers or sellers or review any deeds.

For the 2010-11 tax year, Glasscock identified three sales of detached homes from 2009. (Ptf's Ex 3 at 1.) Her sales were all built in the 1940s and ranged in size from 768 to 1,523 square feet. (*Id.*) The lot sizes ranged from 0.13 to 0.33 acres. (*Id.*) Sale prices of Glasscock's three 2009 sales were $50,000; $56,000; and $11,185, respectively. (*Id.*) Under the heading "bank owned" Glasscock reported that sale 1 was sold by "Freddie." (*Id.*) Peters testified that Glasscock's sale 2 from 2009 was transferred by deed in lieu of foreclosure. She testified that Glasscock's sale 3 from 2009, for $11,185, was a sale between two ex-spouses pursuant to a divorce decree; the sale price was the remaining balance on the mortgage.

Glasscock identified seven sales from 2010 as evidence of the subject property's real market value for the 2011-12 tax year. (Ptf's Ex 3 at 6-7.) Her sales included both detached homes and manufactured homes reportedly built between 1935 and 2000 and ranging in size from 720 to 1,560 square feet. (*Id.*) Lot sizes ranged from 0.11 to 0.8 acres. (*Id.*) Under the heading "bank owned" Glasscock reported that sales 2, 3, and 5 were bank-owned at the time of sale; sale 4 was "HUD"; and sales 6 and 7 were "not in RMLS." (*Id.* at 6-7.)

Peters testified that Glasscock's sale 6 from 2010 was a sale between relatives. She testified that Glasscock's sale 7 from 2010 was not an arm's-length sale; title had previously transferred four times between the same individuals over a few years.

Glasscock found the average sale price of the three 2009 sales was $39,062, or $36 per square foot based on an "[average] square foot" of 1,084. (Ptf's Ex 3 at 1.) She concluded that the real market value of the subject property was $32,348 as of January 1, 2010. (*Id.*) Glasscock reached that value conclusion by determining the subject property's value at $36 per square foot, $50,544, and then multiplying that value by the average percentage of value attributable to land based on her 2009 sales, 64 percent.[4] (*See id.*) Using the same methodology, Glasscock determined that the average sales price of the 2010 sales was $48,858, or $42.50 per square foot based on an "[average] square foot" of 1,148. (*Id.* at 7.) She concluded the subject property's real market value was $36,399 as of January 1, 2011. (*Id.*) Glasscock reached that value conclusion by determining the subject property's value at $42.50 per square foot, $59,670, and then multiplying that value by the average percentage of value attributable to land based on her

---

[4] Glasscock determined the percentage of value allocated to land for each of her comparable sales based on the 2012 assessment and tax roll values for each sale. (Ptf's Ex 3 at 1.) For example, Glasscock's sale 1 had a 2012-13 real market value of $100,947, with $62,000 allocated to the land and $38,947 allocated to the improvements. (*Id.*) The land value of Glasscock's sale 1 was 61 percent of its total value. (*Id.*)

2010 sales, 61 percent.[5] (*See id.*)

Defendant questioned why most of Glasscock's comparable sales were improved sales, given her conclusion that the subject property would sell as bare land. Glasscock testified that there were not many bare land sales in the subject property's market in 2009 and 2010, so she used improved sales and removed improvement values.

Hartman testified regarding several sales between February 2010 and May 2012 of homes that he considered to have been in livable condition.[6] (*See* Ptf's Ex 4 at 1-8, 20.) He testified that he provided the sales only to show what could be purchased for under $100,000. (*See id.*) Hartman also identified three land only sales from 2009, 2010, and 2013. (*Id.* at 9-13, 20.) His land only sales were a 0.28-acre lot that sold for $31,000 in February 2013; a 0.51-acre lot that sold for $36,500 in December 2010; and a 0.35-acre lot that sold for $43,000 in April 2009. (*Id.*) Hartman time trended his sales to the 2010-11 and 2011-12 tax years. (*Id.*) He concluded a land value of $37,830 for the subject property as of January 1, 2010, and a value of $35,469 as of January 1, 2011. (*Id.* at 20.) Hartman testified that he added the cost of water and sewer, $10,930 total,[7] to those land values and concluded the subject property's real market value was $48,760 as of January 1, 2010, and $46,339 as of January 1, 2011. (*Id.*)

B.     *Defendant's value evidence*

Peters determined that the subject property's highest and best use was "as improved residential property." (Def's Ex A at 3.) She identified several comparable sales for each of the

---

[5] Glasscock determined the percentage of value allocated to land for each of her comparable sales based on the 2012 assessment and tax roll values for each sale. (Ptf's Ex 3 at 6-7.)

[6] Hartman included the sale at 138 Yoder in his list of "sale incl. houses," but he testified that it should have been a land only sale because $65,000 was the price the buyer paid for the land, OSDs, and slab; the structure was moved by the seller. (Ptf's Ex 4 at 9, 20.)

[7] Hartman provided the schedule of water service rates as of October 12, 2009, applicable to the subject property's water district and prices from the subject property's sewer district. (Ptf's Ex 4 at 14-15.)

tax years at issue. (*Id.* at 3-4.) Peters testified that all of her comparable sales were located within one mile of the subject property and in the "Green area." (*Id.* at 3.) She found that "[t]he properties most comparable to the subject[] [property's] year built and condition were not all arm[']s[-]length transactions. Most of the sales were comprised of foreclosure and short sales; therefore those sales were used in [her] analysis." (*Id.* at 3.) Peters made adjustments to her comparable sales for differences from the subject property. (*Id.* at 3-4.) She testified that her gross living area adjustments were based on the Oregon Department of Revenue's cost factor book. (*Id.* at 26-27.) Peters testified that she made a downward adjustment of $5,000 to each of her comparable sales because they all had concrete foundations. (*Id.* at 16, 19.)

For the 2010-11 tax year, Peters identified three comparable sales from 2009 that sold for unadjusted prices of $79,000; $88,000; and $85,000, respectively. (Def's Ex A at 16.) She testified that sale 1 was much smaller than the subject property at 720 square feet of gross living area. (*See id.*) Peters testified that sale 2 was also smaller, at 667 square feet, and of inferior quality than the subject property. (*See id.*) Peters testified that sale 3 was located in an industrial area and zoned M2, which is inferior to the subject property. (*See id.*) She testified that she could not identify a time trend for 2009, so she made no time adjustments to her 2010-11 comparable sales. Peters concluded adjusted values of $101,508; $113,794; and $91,000 for her three 2010-11 comparable sales for an indicated value of $102,000 (rounded) for the subject property as of January 1, 2010. (*Id.*)

Peters identified three comparable sales from 2010 and 2011 for the 2011-12 tax year that sold for unadjusted prices of $89,000; $57,750; and $103,400, respectively. (Def's Ex A at 19.) She testified that, like the subject property, all of her 2011-12 comparable sales were located in the "100 [year] flood plain on the current FEMA map[.]" (*See id.* at 3.) Peters testified that she

determined a downward time trend of 0.0025 per month for 2011 sales, so she made an upward time adjustment to sale 2 which sold in March 2011.[8] (*Id.* at 19.) Peters' sale 2 for the 2011-12 tax year was located "a few houses [away] from the subject [property] * * *." (*Id.* at 4.) She testified that sale 1 was an inferior class/quality of 2-, so she used an adjustment of $44 per square foot for the gross living area, whereas she used an adjustment of $62 per square foot for her other sales. (*See id*. at 19.) Peters concluded adjusted values of $107,280; $76,485; and $109,840 for her three 2011-12 comparable sales, for an indicated value of $98,000 (rounded) for the subject property as of January 1, 2011. (*Id.*)

Peters also completed a land sale analysis based on seven land sales. (Def's Ex A at 4.) She testified that she considered both sales of unimproved properties and sales of improved properties purchased for the land only. (*See* Def's Ex A at 20-23.) Peters identified three 2010 sales of improved properties purchased for the land only with unadjusted sale prices of $65,000; $64,000; and $77,000. (*Id.* at 23.) The properties were 0.36 acres, 0.47 acres, and 0.55 acres, respectively. (*Id.*) Peters made adjustments to the sales for time, site size, access/topography, and building removal and concluded adjusted sales prices of $66,790; $59,160; and $67,690, respectively. (*Id.*) She determined those sales indicated a value of $65,000 (rounded). (*Id.*)

Peters identified four sales from 2009, 2010, and 2011 of unimproved properties purchased with unadjusted sale prices of $70,000; $36,500; $110,000; and $45,000. (Def's Ex A at 23.) The properties were 0.27 acres, 0.51 acres, 0.61 acres, and 0.35 acres respectively. (*Id.*) Peters' first unimproved land sale included a garage, "but no on-site developments/utilities;" she adjusted downward by $10,000 for the garage. (*Id.* at 21, 23.) Her third unimproved sale was "dividable," so she made a downward adjustment representing half the unadjusted sale price.

---

[8] Peters provided Market Condition Change Analyses for 2010 and 2011 to support her time adjustments. (Def's Ex A at 24-25.)

(*Id.* at 22-23.) Peters made adjustments to the sales for time, site size, and access/topography and she added $17,500 to each land sale for onsite developments.[9] (*Id.* at 23.) She concluded adjusted sales prices of $82,630; $61,590; $71,670; and $68,850, respectively. (*Id.*) Peters determined those sales indicated a value of $71,000 (rounded). (*Id.*)

C.    *Tax roll values and requested values*

The subject property's 2010-11 tax roll real market value was $149,664 and its 2011-12 tax roll real market value was $136,222. (Def's Ex A at 1.) Hartman verbally amended Plaintiff's Complaint at trial to request a 2010-11 real market value of $48,760 and a 2011-12 real market value of $46,399 for the subject property. (*See* Ptf's Ex 4 at 20.) Defendant's appraiser, Peters, concluded that the subject property's 2010-11 real market value was $102,000 and its 2011-12 real market value was $98,000. (Def's Ex A at 2.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 and 2011-12 tax years. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

/ / /

___

[9] Peters testified that she reviewed the Oregon Department of Revenue's guide to onsite developments. For her onsite developments adjustment, Peters used $5,000 for "Lot Prep/Excavation"; $3,000 for "Green Sanitary (sewer);" $4,000 for "Robert's Creek Water;" $3,000 for "Utilities (Electric/Phone/cable installation/misc);" and $2,500 to $5,000 for "Landscape." (Def's Ex A at 23.)

The assessment date for the 2010-11 tax year was January 1, 2010, and the assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Here, both parties relied on the sales comparison approach.

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 *3.

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. * * *."

OAR 150-308.205-(A)(2)(c).

Plaintiff has the burden of proof and must establish her case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of*

*Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Land sales analyses*

Glasscock determined the subject property's improvements had no value as of the 2010-11 and 2011-12 tax years and the subject property should be valued as land only. However, she used only improved sales in her comparative market analyses because she could not identify many bare land sales. In order to determine the value of the subject property as land only, Glasscock sought to remove from each of her sales the value attributable to the improvements. She multiplied the average value per square foot of her sales by the average percentage of value attributable to the land, determined by reference to the assessment and tax roll values. Glasscock made no other adjustments to her sales. Glasscock's approach is not one described by OAR 150-308.205-(A) and she did not provide any authority supporting her approach. The court gives no weight to her comparative market analyses.

Hartman, like Glasscock, concluded that the subject property should be valued as land only with site developments and he analyzed three land sales. Hartman clarified at trial that Plaintiff's requested real market values for the 2010-11 and 2011-12 tax year are based on his land sales analysis. Hartman time trended three land sales from 2009, 2010, and 2013 and added $10,930 to his sales for water and sewer costs. Based on that analysis, Hartman concluded the subject property's real market value was $48,760 as of January 1, 2010, and $46,339 as of January 1, 2011. (*Id.*)

Peters analyzed the subject property's land value using both sales of unimproved properties and sales of improved properties purchased for the land only. She adjusted each of

her sales for differences from the subject property and she added $17,500 to each of her unimproved sales for the cost of onsite developments. Based on that analysis, she found that the improved properties sold for land only indicated a land value of $65,000 (rounded) and the unimproved land sales, including the cost of onsite developments, indicated a land value of $71,000 (rounded).

B.      *Improved sales analysis*

Peters relied primarily on her analysis of improved sales, based on which she concluded that the subject property's real market value was $102,000 for the 2010-11 tax year and $98,000 for the 2011-12 tax year. Although Peters determined the subject property was in "fair" condition and noted that "some deferred maintenance need[ed] attention[,]" she did not express any opinion as to the cost to cure. Peters noted in her report that Plaintiff failed to provide any cost to cure estimates prior to the exhibit exchange. (Def's Ex A at 3.)

For both tax years at issue, Peters' net adjustment to each of her sales was upward, due in large part to the fact that all but one of her sales was smaller than the subject property. Peters testified that she made size adjustments to each of her sales based on the Oregon Department of Revenue cost factor book. She provided two pages that she relied upon: the 2010 Local Cost Modifier Study based on "All Houses Built in 2008 & 2009 -- sales & construction costs" and the 2011 Local Cost Modifier Study based on "All Class 3 Houses Built in 2009 & 2010 -- sales & construction costs." (Def's Ex A at 26-27.) The 2010 study indicated the price or cost for class 3 and 3+ houses ranged from $51 to $70 per square foot. (*Id.* at 26.) Peters used an adjustment of $62 per square foot for her 2010-11 sales. The subject property was built in 1950, but Peters did not depreciate the 2008, 2009, and 2010 costs to determine a size adjustment.

/ / /

Each of Peters' improved sales included a concrete foundation, whereas the subject property lacked a concrete foundation. Peters made a downward adjustment of $5,000 to each of her sales for its concrete foundation. However, Zerbach testified that the cost to lift the subject property house and install a foundation would be "approximately $35,000 to $40,000." To the extent Peters' adjustments are based on actual costs, it appears that her adjustment for a concrete foundation was too small.

C.      *Reconciliation*

The parties agree that the subject property requires numerous repairs, although the parties did not agree on the total cost to cure. Zerbach testified that the subject property's repairs would cost at least $100,000 whereas a new class 3 home can be built for $68 per square foot, or $95,472 for a 1,404 square foot house.[10] In the evidence he provided for trial, Zerbach specifically discussed the cost to install a foundation ($35,000 to $40,000); the cost to remodel the bathroom ($10,000 to $15,000); and the cost to remove asbestos ($8,618). (*See* Ptf's Ex 2.) He did not specifically identify any other repair costs.

Hartman concluded that the subject property's improvements had no value and determined the real market value of the subject property as land only. Hartman's conclusion appears to have been based on Zerbach's testimony and evidence, discussed above. Peters' appraisal report assumes that the subject property's improvements contributed value to the total real market value, but does not include any supporting analysis. Peters reported that she did not receive any cost to cure evidence from Plaintiff prior to the exhibit exchange. It is unclear what Peters' opinion as to the contributory value of the subject property's improvements would have been had she received cost to cure evidence from Plaintiff prior to the exhibit exchange. Given

---

[10] Peters' cost factor book excerpts support Zerbach's testimony with respect to the cost to construct a class 3 home in 2009 and 2010. (*See* Def's Ex A at 26-27.)

the age and condition of the subject property's improvements, there is a question of whether the improvements contribute any value to the subject property's total real market value. However, the court finds that the evidence presented on that question is inconclusive.

Analyzing the land value only, Hartman concluded that the subject property's real market value was $48,760 for the 2010-11 tax year and $46,339 for the 2011-12 tax year. His land value conclusions included the cost of water and sewer, $10,930, but did not include the cost of other onsite developments. Hartman's land value conclusions are, therefore, understated. Peters determined that an appropriate adjustment for the cost of onsite developments was $17,500. Her evidence indicated that the subject property's land value was in the range of $65,000 to $71,000.

Peters analyzed improved sales, concluding that the subject property's real market value was $102,000 for the 2010-11 tax year and $98,000 for the 2011-12 tax year. She used 2008, 2009, and 2010 construction costs for class 3 houses to adjust all but one of her sales upward. She did not depreciate those costs. Peters' real market value conclusions are likely overstated as a result of those adjustments. Peters made an adjustment of $5,000 for a foundation, whereas Zerbach testified that the actual cost to install a foundation would be in the range of $35,000 to $40,000. Using a $35,000 cost adjustment rather than a $5,000 adjustment for the subject property's lack of a foundation indicates a value of $72,000 for the 2010-11 tax year and value of $68,000 for the 2011-12 tax year.

Both Peters' land sales and her improved sales, adjusted to reflect the cost to install a foundation, indicate that the subject property's real market value was in the range of $65,000 to $72,000 for the 2010-11 and 2011-12 tax years. The court concludes that the subject property's real market value was $72,000 for the 2010-11 tax year and $68,000 for the 2011-12 tax year.

/ / /

### III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court concludes that the subject property's real market value was $72,000 for the 2010-11 tax year and $68,000 for the 2011-12 tax year.  The real market values for the 2010-11 and 2011-12 tax years both satisfy the requirements of ORS 305.288(1).[11]  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as R47338 was $72,000 for the 2010-11 tax year and $68,000 for the 2011-12 tax year.

Dated this ___ day of January 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.***

***This document was signed by Magistrate Allison R. Boomer on January 6, 2014. The Court filed and entered this document on January 6, 2014.***

---

[11] ORS 305.288(1)(b) states:  "The change or correction requested is a change in value for the property for the tax year and it is asserted in the request and determined by the tax court that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent."