IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GENERAL PROPERTY GROUP LLC, )
)
Plaintiff, ) TC-MD 150293C
)
v. )
)
JACKSON COUNTY ASSESSOR, )
)
Defendant. ) **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered May 19, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals the real market value of property identified as Account 10386481 (subject property) for the 2014-15 tax year. A trial was held by telephone on November 30, 2015. Patricia Curtin, Oregon licensed real estate broker, appeared on behalf of Plaintiff . Jeffrey Irish, Deputy Assessor, appeared and testified on behalf of Defendant. Plaintiff's Exhibits 1 to 4 were received without objection. Defendant's Exhibit A was received without objection.

I. PRELIMINARY MATTER

The court issued an Order on June 18, 2015, denying Plaintiff's Motion For Default. That Order is incorporated herein by reference and may be challenged by appeal of the Final Decision, when issued by this court, as explained in the court's June 18, 2015, Order, and the appeal note at the end of this Decision.[1]

---

[1] This court issues a "Decision," after which the parties have 14 days to submit a written request for costs and disbursements pursuant to Tax Court Rule-Magistrate Division (TCR-MD) 16. A "Final Decision" is issued after the original "Decision." The timing of the issuance of a "Final Decision" depends on whether a request for costs and disbursements is made. The "Final Decision" may be appealed pursuant to TCR-MD 19.

## II.  STATEMENT OF FACTS

A.     *Property Description and Condition*

The subject property is commercial property, located on a 0.5 acre parcel (21,780 square feet) of land with approximately 102 feet of frontage on Court Street, a major commercial street in Medford's urban area.  (Def's Ex A at 13; Ptf's Ex 2.)

The property is zoned C-C (Community Commercial District) and is improved with a 64 year old, 2,136 square-foot single story wood framed building configured for use as a restaurant. (Def's Ex A at 13.)  The remainder of the subject property is covered with blacktop paving, most of which is marked by painted stripes for customer parking in the front and rear of the building. (Def's Ex A at 13, 24, 25; Ptf's Ex 3 at 1.)  There are approximately 40 parking spaces on the lot. (Ptf's Ex 3 at 1.)

The building is in a state of disrepair and has been unoccupied since the prior tenant "vacated the premises in the beginning of 2014."  (Def's Ex A at 13, 32.)  According to the testimony of Defendant's appraiser, Plaintiff, who purchased the property in mid-August 2014, began listing the property for lease shortly after its purchase.  Plaintiff's representative did not dispute that testimony.  Defendant's appraisal states that the building is "dated with very minimal updating or modernization since [the] original construction" in 1950.  (Def's Ex A at 13, 4.)  Plaintiff did not challenge or disagree with that statement at trial, and Plaintiff's evidence is silent on the condition of the building.  Defendant reports that "[t]he building shows signs of physical depreciation," and that an interior and exterior inspection revealed "[e]xterior wood siding and single pane windows [that] appear to be original and are cracked and have areas of peeling paint.  [The] building is not energy efficient which would create higher than acceptable heating/cooling expenses for a tenant."  (*Id*. at 13.)  Photographs in Defendant's appraisal report

confirm the dilapidated condition of the building. (*Id*. at 19-22.) The parties agree that the building adds no value to the property, as explained more fully below in Defendant's highest and best use analysis. (Def's Ex A at 28; Ptf's Ex 1 at 1.)[2]

Defendant's appraisal report indicates that "[t]he subject enjoys a good location along one of the most heavily traveled streets in Medford." (Def's Ex A at 8.) That report further indicates that "[t]he City of Medford invested $14 million into downtown redevelopment with almost $7 million spent for construction of The Commons, a new downtown park and band shell." (*Id*. at 9.) The subject property is located a short distance north of the downtown Medford area and is in close proximity to the Rogue Valley Mall to the north. (*Id*. at 11.) "The Rogue Valley Mall * * * serves Southern Oregon and Northern California." (*Id*. at 8.) There are a number of other well-known and established regional and neighborhood commercial centers in the area. (*Id*.) Defendant's appraisal indicates the "[t]he immediate neighborhood is nearly 90% built-up with approximately 5 vacant sites available for new development." (*Id*. at 9.)Defendant's appraisal report indicates that "[t]he C-C district provides for commercial uses that very [sic] from automotive dealers/stations and garages, business services, food stores, hotels, many office uses, restaurants and bars, and many other service commercial uses." (*Id*. at 13.)

Defendant's appraisal report includes the following additional information about extensive new construction in the area. The report reads:

> "[t]he central Medford area has many large new construction projects that have occurred during the past 5-10 years. The trend has reflected a transition from developments with older, interim uses to modern structures that reflect the highest

---

[2] Plaintiff's representative, Curtin, who is a licensed real estate broker, states in a note in her valuation table that her comparable sales valuation of the subject property "does not take into account the condition of the building on the property." (Ptf's Ex 4 at 19.) She goes on to state that "[t]he assessor and the Board of Property Tax Appeals both determined that the structure on the property had no value at all." (*Id*.) Curtin's trial testimony was based on the premise that the building had no value.

and best use transition experienced during extensive urban renewal. * * * Lithia Motors spent $18 million for their new headquarters that includes additional retail and office space. A large 2 story building that housed the Medford Post Office and BLM was tore [sic] down to allow for the construction of the new $36 million Health and Human Services building and parking garage. One West Main, a $20 million office building project was completed in the summer of 2014. Southern Oregon University and Rogue Community College constructed a new $22 million downtown learning center as part of an expansion effort. *These projects and others involved the removal of many old buildings that were tore [sic]* down for the development of projects that reflect the highest and best uses for the area."

(Def's Ex A at 9-10) (Emphasis added).

B.     *The Sale of the Subject Property*

The parties agree that Plaintiff purchased the subject property, a one-half acre lot with a 2,136 square foot building on it, in mid-August 2014, for $150,000. (Ptf's Ex. 1 at 1; Def's Ex A at 4.) The purchase included the adjoining tax lot 8100, a narrow parcel as deep as the subject property and approximately 25 feet wide (approximately 0.14 acres). (Def's Ex A at 4, 9, 14, 25; Ptf's Exs 1 at 1, 3 at 1-2[3].) According to Defendant's appraisal, the small adjacent parcel included in the sale of the subject property "has been used as ingress/egress to the back parking lot of the Subject * * *." (Def's Ex A at 9.) The sale of the subject property also included all of the restaurant's personal property and equipment. (Ptf's Ex 3 at 1; Def's Ex A at 4.) At the time of purchase, the property had been on the market and listed for sale for 286 days (slightly more than seven months). (Ptf's Ex 1 at 1.) The list price was $229,000. (Ptf's Ex 3 at 1; Def's Ex A at 4.)

The remarks in the Multiple Listing Service (MLS) listing for the subject property state:

"Turn Key ready restaurant and property. All equipment included as-is, newer

---

[3] Plaintiff's Exhibit 3 is an MLS printout that shows the sale of the subject property restaurant on a 0.64 acre lot comprised of two tax lots, 7800 and 8100. Defendant's appraisal reports the subject property to be a 0.5 acre parcel that sold with the adjacent vacant lot for $150,000 on August 14, 2014. (Def's Ex A at 4, 13.) Plaintiff's evidence also indicates that the subject property is 0.5 acres. (Ptf's Ex 4 at 19.) Subtracting 0.5 acres for the subject property, a figure both parties agree with, from the total 0.64 acres for the two tax lots as reflected in Plaintiff's evidence of the MLS listing, leaves a 0.14 acres as the size of the adjoining lot included in the purchase.

hood. Large parking lot approximately 40 spaces. Thousands of cars pass by this thoroughfare daily. High exposure with monument sign, and *priced to sell*. Walk in cooler, private office, staff rest room. Covered outdoor seating, and possible drive up (Buyers to conduct own due diligence with city of Medford planning for all uses). Lot size is over a half acre. Interior showings by appointment only."

(Ptf's Ex 3 at 1) (Emphasis added).

C.      *The Roll Value and the Parties' Value Requests*

Defendant initially set the real market value of the subject property at $505,870, with $395,130 allocated to the land and $110,740 to the "Structures, etc." (Compl at 2.) Plaintiff appealed to the Jackson County Board of Property Tax Appeals (Board), and the Board reduced the real market value to $283,240, a reduction of $222,630. The Board set the land at $282,140 and the "structures etc." at $100. (*Id.*) Plaintiff appealed the Board's value to this court, requesting a reduction in the total real market value (land and structures, etc.) to $124,224. (*Id.* at 1.) In its Answer, Defendant requested that the court "sustain the 2014-2015 tax roll values." (Ans at 1.) At trial, Defendant requested a real market value of $336,700, a figure consistent with Defendant's real market value conclusion in its appraisal report, and $53,460 above the Board's value determination. (Def's Ex A at 33.)

D.      *Plaintiff's Value Evidence*

Plaintiff's first exhibit is a narrative summary of the subject property that indicates, among other things, that the subject property "was purchased on August 12, 2014, along with 0 Court St (TL 8100) for $150,000." (Ptf's Ex 1.) Plaintiff calculates the proportionate value of the subject property to be $124,224, because the sale involved 78 percent of the land included in the $150,000 sale price (the subject property, tax lot 7800, is 0.5 ac. and the adjoining property, tax lot 8100, is approximately 0.14 ac.), and all the improvement value. (*Id.*)

/ / /

Plaintiff also included a plat map for the subject property and the three-page MLS listing summary of the subject property. (Ptf's Exs 2 and 3.)

Plaintiff's final exhibit is a 19 page document that presents information on the sales of nine improved properties in Medford that sold between September 2013 and May 2014 for prices ranging from a low of $70,000 to a high of $540,000. (Ptf's Ex 4 at 1-19.) The properties had buildings that ranged in size from 1,800 square feet to 50,000 square feet. (*Id.*) There is some discrepancy in the reported size of the three of the lots. Plaintiff's MLS sales information indicates that three of the properties had no acreage (sales 2, 3, and 6), whereas Plaintiff's sales table, which Plaintiff's broker/representative Curtin generated, indicates that those properties had 0.43 acres, 0.39 acres, and 0.2 acres, respectively. (*Id.* at 19.) Plaintiff's representative testified that she relied on the lot size information found in Defendant's public tax records. The other six properties had lots ranging in size from 0.11 acres 0.95 acres. (Ptf's Ex 4 at 1-18, 19.) The court accepts Curtin's acreage figures for the three sales for which the MLS listing indicated zero acres.

Plaintiff used the actual sale prices, building size, and acreage to calculate an average price per square-foot for the improvements and an average price per acre for the land. (Ptf's Ex 4 at 19.) Because the parties approach the valuation exercise based on the premise that the value of the property lies in the land, Plaintiff's focus was on the land, and specifically the average price per acre, which was calculated to be $293,809.22. (*Id.*) Plaintiff arrived at that figure (as well as the average price per square-foot of the improvements) by taking the actual sale prices for the nine comparable sale properties, then looking at the real market values for those nine sales as they appear on the county's assessment and tax rolls, and extrapolating the percentage of real market value attributable by the assessor to the land and improvements from the county's

records. (*Id*.) Plaintiff then applied those percentages to the comparable sales prices. (*Id*.) The improvement real market value average was $18.51 and the average price per acre was $293,809 (rounded). (*Id*.) Plaintiff multiplied the $293,809.22 calculated average price per acre by the subject property's 0.5 acre size and arrived at a land value estimate for the subject property of $146,904.61. (*Id*.) Plaintiff also calculated an improvement value of $39,537.36, but noted that both the assessor and the board "determined that the structure on the property had no value at all." (*Id*.) Plaintiff concludes, therefore, that "the RMV based on comparable properties should be $146,904.61." (*Id*.)

As indicated above, Plaintiff has requested a reduction in the real market value to $124,224, based on the proportionate value of the purchase price.

E.    *Defendant's Value Evidence*

Defendant's appraisal report and trial testimony began with a determination of the property's highest and best use. (Def's Ex A at 26.) In its highest and best use analysis, Defendant's appraisal report states that "the Subject improvements are not considered to be the highest and best use for the site." (Def's Ex A at 28.) Defendant's report concludes that the current use is an interim use because of "[t]he age, condition and lack of updating of the Subject improvements." (Def's Ex A at 28.) Defendant's report indicates that "[t]he Subject improvements no longer contribute to the value of the [S]ubject and the value of the property is worth more vacant than as improved." (*Id*.) That report goes on to state that "[t]his is proven by the Sales Comparison Approach of the Subject, as if vacant, which produces a greater value than an Income Approach, as improved, which are both included in this report." (*Id*.) Defendant concludes that "[t]he current restaurant building on site is not the highest and best use for the property. The highest and best use is considered to be development with a building suited for

retail use. * * * The Subject value is totally attributed to the land which by itself has a greater value than if the building was leased and occupied by a restaurant." (*Id*. at 27.)

Defendant's report includes several excerpts from a well-known and authoritative treatise on property valuation – Appraisal Institute's, *The Appraisal of Real Estate*. The first excerpt from that treatise states that " '[t]he use that a site or improved property is put to until it is ready for its highest and best use has traditionally been known as the interim use * * *.'" (*Id*. at 28)(quoting Appraisal Institute, *The Appraisal of Real Estate* 354 (14 ed 2014)). Another excerpt from Defendant's report taken from *The Appraisal of Real Estate* states that " '[a]n interim use is not the highest and best use of the property at the present time, and it should not be represented as the subject property's current highest and best use.' " (*Id*.) Defendant's report further states " 'if the net return of the property as improved is less than the amount that could be earned by the vacant land, the improvements do not have contributory value * * *.' " (*Id*.) Finally, Defendant's appraisal report includes the following quote from *The Appraisal of Real Estate*: " 'the interim use may have value to the property user to the extent that the income generated by the improvements defrays the cost of carrying the property and the cost of demolishing the improvements.' " (*Id*.)

Both in her documentary evidence and at trial, Plaintiff's representative accepted Defendant's conclusion that the building had no value, testifying repeatedly that her value estimate was attributed to the land only, as was Defendant's. (Ptf's Ex 4 at 19.)

Defendant valued the property using both the sales comparison approach and the income capitalization approach. (Def's Ex A at 30-33.)

/ / /

/ / /

1.    *Comparable sales approach*

For its sales comparison approach, Defendant used five sales in Medford that sold between April 2011 and July 2015. (*Id*. at 30.) The properties sold for between $115,000 (sale #5) and $450,000 (sale #4). (*Id*.) All are zoned C-C, like the subject property, except sale #4 that was zoned G-C (General Commercial), and had "net usable" lot sizes ranging from 7,405 square feet (sale #5) to 33,977 square feet (sale #4). (*Id*.) That equates to a range of approximately 0.17 acres to 0.78 acres, compared to the subject property's 0.5 acres. Three of the five comparables are less than 10,000 square feet compared to the subject at 21,780 square feet. (*Id*.) On a square footage basis, those properties sold for between $13.24 (sale #4) and $18.37 (sale #2). (*Id*.) Defendant made qualitative adjustments to those figures and arrived at a range from a low of $13 per square foot (sale #1) to a high of $18.37 per square foot (sale #2). The subject property sold for $6.89 per square foot in August 2014. (*Id*.) Defendant arrived at a final value estimate of $16 per square foot, which when multiplied by the subject property's size of 21,780 square feet, gave an indicated value of $348,480. (*Id*. at 31.) Defendant noted that while "[c]omparable[] [sales #] 3 and 5 occurred after the valuation date of a 01/01/14 [they] support the value estimate." (*Id*.) Defendant gave the least weight to sale #4 and the "greatest consideration" to comparable sales #1 and #2. (*Id*.) Defendant then subtracted the cost of demolishing the existing structure on the property based on cost information from the Marshall & Swift Cost Manual (year of manual not given), which Defendant determined was $5.50 per square foot, or $11,750. (*Id*.) Subtracting that figure from the $348,480 value estimate for the land, Defendant concluded with a final value estimate under the sales comparison approach of $336,700 (rounded). (*Id*.)

/ / /

2.    *Income capitalization approach*

Defendant's income capitalization approach is based on a current listing for the lease of the subject property at $1 per square-foot (which comes to $2,136 per month) and a prior listing by a different management company of the subject property for $1,850 per month, which comes to approximately $0.87 per square-foot. (Def's Ex A at 32.) Defendant also considered comparisons to a market survey conducted by the assessor's office, information from an automated income approach database, and "an old restaurant building with a similar obsolescence * * * in Medford [that] is leased for $1.33/sq.ft., per month." (*Id*.) From that information, Defendant concludes that a monthly lease amount of $2,000 is appropriate. (*Id*.) After subtracting 10 percent for vacancy and collection and 10 percent for expenses, Defendant arrived at a net operating income for the subject property of $19,440. (*Id*.) Defendant capitalized that income at 8.5 percent to arrive at a market value estimate under the income approach of $228,700 (rounded). (*Id*.) Defendant did not identify its source for vacancy rate, expense ratio, or capitalization rate.

3.    *Reconciliation*

In its reconciliation, Defendant notes that the final indicated value under the income approach is $216,000. (*Id*. at 33.) While that number is not explained in the report, it appears that Defendant subtracted the estimated $11,750 demolition costs it used in the sales comparison approach from the $228,700 value estimate under the income approach. Defendant concludes that the real market value for the subject property, as of January 1, 2014, was $336,700. (*Id*.) That figure is Defendant's value estimate under the sales comparison approach, which Defendant concludes is the more reliable indicator of market value because "[t]he market value of the land is based entirely on its highest and best use." (*Id*.) Defendant again refers to the language on

highest and best use set forth in *The Appraisal of Real Estate*, as quoted above, which can be summarized as follows: when a property is worth more vacant than with improvements, the highest and best use is as though vacant and the value lies entirely in the land. (*Id*.) Defendant's witness testified that the sales comparison approach offered the best indicator of value, and indicated that that testimony is borne out by Defendant's appraisal report.

## III. ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year.

A.    *Real Market Value and Burden of Proof*

ORS 308.205(1) defines real market value:[4]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; ORS 308.210(1).

Because Plaintiffs are the party seeking affirmative relief, they have the burden of proof and must establish by a "preponderance" of the evidence that there is an error in the real market value appearing on the assessment and tax rolls. ORS 305.427; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves*, 4 OTR at 312. "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [its] burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

/ / /

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

To sustain the burden of proof, a taxpayer must "provide competent evidence of the [real market value] of [the subject] property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes [but is not limited to] appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D at 7, WL 879285 (Mar 13, 2012).

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

B.     *Plaintiff's Evidence*

1.     *Sale price of the subject property*

Plaintiff purchased the subject property in August 2014, which was roughly seven months after the January 1, 2014, assessment date. The $150,000 sale price included the adjoining narrow and rectangular shaped lot approximately 0.14 acres in size that, according to Defendant, has been used for overflow parking by adjacent property owners and their customers and tenants. Plaintiff did not dispute that fact.

In *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973), the Oregon Supreme Court ruled that "[a] recent sale of the property in question is important in determining its market value." The court went on to state that "[i]f the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then *the sales price*, while certainly not conclusive, *is very persuasive of the market value*." *Id.* (citations omitted)(emphasis added).

The court finds that the sale of the subject property was a "recent" sale and that it involved a voluntary arm's-length transaction. Defendant did not contend, nor does the evidence suggest, that Plaintiff's purchase was not arm's-length. The parties (buyer and seller) are not related nor is there any indication that they have or have had any business dealings together in the past. Accordingly, the court finds Plaintiff's $150,000 purchase price to be highly persuasive evidence of the real market value of the subject property on the assessment date. And, the purchase included the adjoining tax lot, which is a vacant and *potentially* developable[5] narrow rectangular lot approximately 0.14 acres in size (approximately 6,000 square feet). Plaintiff's representative Curtin divided the purchase price on a proportionate basis based on the size of the subject property and the adjoining tax lot that was purchased with the subject property, concluding with the value estimate of $124,224. (Ptf's Ex 1.)

2. *Comparable sales approach*

Plaintiff's comparable sales analysis has no persuasive value. The properties sold for a wide range in price, from a low of $70,000 (sale #8) to a high of $540,000 (sale #1). (Ptf's Ex 4 at 1, 15.) Only two of Plaintiff's nine sales had similar size lots (sales #2 and 3). (*Id*. at 19.) Of the remaining seven, one was nearly twice the size of the subject property (sale #1 at 0.95 acres) and the remaining six were less than half the size of the subject property. (*Id*. at 1, 3, 5, 7, 9, 11, 13, 15, and 17.) Additionally, Plaintiff's comparable sales varied in their zoning and the sale prices included improvements of various types from commercial and industrial buildings to warehouses and a residential home. (*Id*.) And, Plaintiff's representative Curtin then used a convoluted averaging process, unsupported by any appraisal methodology, to estimate the value

---

[5] The development potential of the adjoining tax lot is questionable because it is only approximately 25 feet wide and is surrounded by undeveloped properties, including the subject property. According to Defendant, that adjoining lot has been used for overflow parking by the adjoining property owners. There is evidence from Defendant in the related appeal concerning that parcel suggesting several possible uses for that lot, but that information is not in evidence in this appeal and Plaintiff refuted Defendant's proposed potential development uses.

per acre involving the actual sale prices of her comparable sales, the county's roll values for those properties, and the percentage of value the county attributed to the land and improvements for each of the nine properties. (*Id*. at 19.) She then multiplied that per acre value by the size of the subject property. "In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 at *3 (Apr 25, 2012).

C.      *The Court's Observations Regarding the Evidence*

The parties agree that the subject property is located on a busy street in a highly developed commercial area. Defendant reported that there has been active, extensive development in the area for the past five to ten years. (Def's Ex A at 7-10.) Defendant's report was written in 2015, which presumably means that timespan covers the assessment date. The area is 90 percent built up, according to Defendant, and there are only five undeveloped lots near the subject property. (*Id*. at 9.) The property's zoning (C-C) allows a wide range of commercial development, ranging from automotive dealers and garages to grocery stores, restaurants and bars, office buildings, and hotels. (*Id*. at 13.) Defendant further reports that the "central Medford area" has experienced numerous construction projects in "the past 5 [to] 10 years * * * reflect[ing] a transition from developments with older, interim uses to modern structures that reflect the highest and best use transition experienced during [the recent] extensive urban renewal." (*Id*. at 9.) Defendant's report goes on to state that "[t]hese projects and others involved the removal of many old buildings that were tor[n] down for the development of projects that reflect the highest and best uses for the area." (*Id*. at 10.)

/ / /

The extent of the redevelopment in the area of the subject property involving the removal of older buildings for replacement with new buildings shows that it was common knowledge among real estate professionals, including owners, investors, and developers, that the area was ripe for redevelopment and that properties in the "interim use" category Defendant describes were attractive to potential buyers whose intent was to remove older existing buildings for replacement with newly constructed buildings. In the court's view, the fact that the subject property, which is well located on a busy street and situated in the midst of all the reported redevelopment, sold for only 65 percent of the asking price after nine months of active marketing by qualified professionals, tends to show that the market did not view the subject property favorably.

D.      *Defendant's Evidence*

1.      *Sales comparison approach*

Turning to Defendant's sales comparison approach, Defendant's comparable sales are problematic. Three of the five comparables (sale #'s 1, 3, and 5) are less than half the size of the subject property, and comparable sale #2 was conveyed by quitclaim deed. (Def's Ex A at 45.) Moreover, Defendant's adjustments are all "qualitative," without sufficient detail explaining them. (*Id.* at 30.) For example, Defendant determined all sales to be "similar" in terms of the date of sale, yet one sold in April of 2011 (sale #4), 32 months prior to the assessment date, and two others sold in May 2013 (sale #2) and July 2013(sale #1). Another of Defendant's comparables (sale #5) sold in July 2015, roughly 18 months after the assessment date. (*Id.*) Defendant's appraisal reports "many large new construction projects * * * occur[ing] during the past 5-10 years[,]" and that report, as well as Irish's trial testimony, indicates that the market was fairly active on and before the applicable assessment date. (*Id.* at 9.) If this is true, the court is

surprised that Defendant could not produce comparable sales closer to the assessment date. Additionally, Defendant's comparables sold for prices ranging from a low of $115,000 (sale #5) to a high of $450,000 (sale #4). (*Id*.) It appears to the court that Defendant has been unable or unwilling to view the evidence as a whole and recognize that its position regarding highest and best use, and the ultimate value of the subject property, simply fails to account for contrary evidence.

       2.     *Income capitalization approach*

Defendant performed at brief income approach, but it too lacks persuasive value. Irish's potential gross income estimate is supported by the lease amount Plaintiff was offering to rent the subject property. (Def's Ex A at 32.) However, his vacancy/collection loss and expense percentages, each of which are estimated to be 10 percent, are not explained, and his 8.5 percent capitalization rate is also not explained. (*Id*.) And, to the extent it has any probative value, Irish's $228,700 estimate under the income capitalization approach tends to support the $229,900 list price for which the subject property was advertised, but never sold.

## IV. CONCLUSION

After a thorough and painstaking review of the evidence, the law, and the applicable principles of property valuation, the court concludes that Plaintiff has established by a preponderance of the evidence that the real market value of the subject property, Account 10386481, was $125,000 as of the January 1, 2014, assessment date for the 2014-15 tax year. The court further concludes that Defendant failed to offer persuasive evidence to support its request for a real market value of $336,700, a figure $53,460 above the Board's value determination of $283,240. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that the real market value of the subject

property, Account 10386481, was $125,000 as of January 1, 2014.

Dated this ___ day of June 2016.


_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on June 7, 2016.*