IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GENERAL PROPERTY GROUP LLC,     )
     )
     Plaintiff,     )     TC-MD 150294C
     )
     v.     )
     )
JACKSON COUNTY ASSESSOR,     )
     )
     Defendant.     )     **FINAL DECISION**[1]

Plaintiff appeals the real market value of property identified as Account 10386513 (subject property), Tax Lot 8100, for the 2014-15 tax year. A trial was held by telephone on November 30, 2015. Patricia Curtin (Curtin), Oregon licensed real estate broker, appeared and testified on behalf of Plaintiff. Jeffrey Irish (Irish), Deputy Assessor, appeared and testified on behalf of Defendant. Also testifying for Defendant was David Arrasmith, Commercial Lead Appraiser, Jackson County Assessor's Office. Plaintiff's Exhibits 1, 2, 3, 4-1, 4-2, 4-4, 4-6, 5-1, 5-2, and 5-18 were received without objection. Defendant's Exhibit A was received without objection.

## I. STATEMENT OF FACTS

A.    *Property Description and Condition*

The subject property is a long and narrow undeveloped asphalt paved lot approximately 0.14 acres (6,098 square feet) in size that is about 26 feet wide and 235 feet deep, located on

/ / /

/ / /

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered June 14, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

Court Street, a major commercial street in Medford's urban area.[2]  (Def's Ex A at 10 through 15; Ptf's Exs 1 and 2.)  Court Street is a busy three lane, one-way street.  (Def's Ex A at 12.) Defendant's appraisal report indicates that Court Street "is in Medford's urban area and is a major commercial collector street for the northern urban areas of Medford.  (*Id*. at 10.)  The report explains that, with respect to the stretch of the street where the subject property is located "[t]here are not any nearby traffic signals on Court [Street] but, overall, the parcel has good visibility."  (*Id*. at 11.)  The property has "[i]ngress and egress * * * by a paved entryway off Court St."  (*Id*.)  That entry is a curb cut on Court Street allowing access to the lot from the busy street.  (*Id*. at 10.)  Because Court Street is a one-way street, vehicles can only enter and exit the lot by making a left turn.  (*Id*. at 14.)

The parties agree that Plaintiff purchased the subject property along with the adjoining one-half acre lot with a 2,136 square foot building on it, in mid-August 2014, for $150,000. (Ptf's Ex 1 at 1; Def's Ex A at 4.)  The list price was $229,000.  (Ptf's Ex 3 at 1; Def's Ex A at 4.)  The parties agree that the property had been on the market and listed for sale for 286 days (slightly more than nine months) before Plaintiff's purchase.  (Ptf's Ex 1 at 1.)  According to the testimony, the subject property was used as ingress/egress to the back parking lot of the adjoining property with the dilapidated and now unoccupied restaurant building Plaintiff acquired as part of the purchase of the subject lot.  Defendant notes in its appraisal report that the subject property was sold for "65% of the listing price," and that "the typical selling to listing

/ / /

---

[2] Plaintiff's Exhibit 3 is a printout of an MLS listing that shows the sale of the subject property along with the adjoining half acre lot improved with 2,136 square foot building constructed in 1950 that collectively comprise a 0.64 acre parcel carried in Defendant's records as two tax lots, 7800 and 8100.  This appeal involves Tax Lot 8100. The parties agree the adjoining lot is approximately one-half acre in size.  The court issued a Decision on that lot (TL 7800), finding it to be 0.5 acres.  TC-MD 150293C (May 19, 2016).  Defendant's appraisal reports the subject property to be a 0.13 acre parcel that sold with the adjacent vacant lot.  (Def's Ex A at 10.)  Subtracting the 0.5 acres for the adjoining lot from the total 0.64 acres for the two tax lots leaves 0.14 acres as the size of the subject property.

price percentage, per the Rogue Valley Association of Realtors in Medford, is from 92.5%-96.5% for 12/2013-12/2014." (Def's Ex A at 4.)

The facts about the location, development, and recent commercial development activity in the area of the subject property are set forth in considerable detail in this court's Decision in the companion appeal involving the adjoining tax lot. *See* TC-MD 150293C (May 19, 2016). It is sufficient to note that the subject property is on a busy street in the central part of the city of Medford, in a highly developed area where a considerable amount of new construction "ha[s] occurred during the past 5-10 years * * * [including] extensive urban renewal" costing the city $14 million for various redevelopment projects, an $18 million private sector automotive headquarters, and several other projects, public and private, costing approximately $20 million each. (Def's Ex A at 7.)

The subject property is zoned C-C, Community Commercial, which "provides for commercial uses that vary [sic] from automotive dealers/stations and garages, business services, food stores, hotels, many office uses, restaurants and bars, and many other service commercial uses." (*Id*. at 10.) Defendant's appraisal indicates the "[t]he immediate neighborhood is nearly 90% built-up with approximately 5 vacant sites available for new development." (*Id*. at 7.) Defendant's report further explains:

> "Across the street is Medford Fabrication that occupies several buildings, one of which is a large, older industrial building that appears to be in less than average condition. South of the Subject parcel is a one-story, multi-unit retail building that appears to be in average condition. At the rear boundary of the Subject is an alleyway."

(*Id*.) That report goes on to explain that properties in the immediate area of the subject property vary widely from "retail use buildings," including "several * * * converted residences," to vehicle sales and repair shops "that are of low-cost construction," and "[s]everal one-story, small office buildings." (*Id*.)

B.     *The Roll Value and the Parties' Value Requests*

Defendant set the real market value of the subject property at $100,670, with $94,430 allocated to the bare land and $6,240 to the on-site and improvements which, according to Defendant's appraisal report consist of the asphalt paving.  (Compl at 2.)  Plaintiff appealed to the county board of property tax appeals (Board), and the Board reduced the total real market value to $60,980, with the entire reduction coming off the bare land.  (*Id.* at 2.)

Plaintiff appealed the Board's value to this court, requesting a reduction in the total real market value (land and structures, etc.) to $25,776.  (*Id*. at 1; Ptf's Ex 1.)  In its Answer, Defendant requested that the court "sustain the 2014-2015 tax roll values."  (Def's Ans at 1.)  At trial, Defendant requested a real market value of $89,100, a figure consistent with Defendant's real market value conclusion in its appraisal report, and $28,120 above the Board's value determination.  (Def's Ex A at 20.)

C.     *Plaintiff's Value Evidence*

Plaintiff's first exhibit is a narrative summary of the subject property that indicates, among other things, that the subject property "is a 25.9' strip of vacant land, which has no development potential. * * * The property is too narrow for any sort of development."  (Ptf's Ex 1 at 1.)  That exhibit further indicates that the subject property "was purchased on August 12, 2014, along with 1124 Court St (TL 7800) for $150,000."  (*Id*.)  Plaintiff calculates the proportionate value of the subject property to be $25,776, because the sale involved 22 percent of the land included in Plaintiff's $150,000 purchase of the subject property and the adjoining one-half acre tax lot that had a building the parties agree had no value at the time of the sale.  (*Id*.)  That is the value Plaintiff seeks in this appeal ($25,766).

Plaintiff also included a plat map for the subject property and the three-page MLS listing of the subject property.  (Ptf's Exs 2 and 3.)

FINAL DECISION  TC-MD  150294C                                                                                    4

Plaintiff's Exhibit 4 is a seven-page document with information on the sale price of three essentially bare land properties that ranged in size from 0.13 acres to 0.23 acres. (Ptf's Ex 4.)[3] During trial Plaintiff's representative Curtin indicated that she was only relying on one of the three sales, the 0.23 acre lot that sold on December 9, 2013 for $38,000, or $3.79 per square foot. (*Id*. at 2.) Curtin testified that at $3.79 per square foot, the value of the subject property would be $23,112, and pointed out that her value estimate was slightly higher than that, at $25,776.

Plaintiff's final exhibit is an 18 page document with information on ten sales of developed properties that varied widely both in terms of the size of the structure and the acreage involved. (Ptf's Ex 5.) Plaintiff extrapolated a land value of the $6.74 per square foot from those sales and noted that the subject property would have a land value of $41,133.29 based on that per square foot average. (*Id*. at 18; Curtin's Trl Test.) However, Curtin testified at trial that all of those properties were developable whereas, in her opinion, the subject property had no development potential and the real market value would therefore be much lower. Curtin's appraisal report includes a conclusory note that states: "[w]ithout development potential, [the subject property] essentially has no value on its own." (Ptf's Ex 5 and 18.) When questioned by Defendant on cross examination Curtin testified that she had been a land use consultant "for many years."

As stated previously, Plaintiff has requested a reduction in the real market value to $25,776, based on the proportionate value from the purchase price.

D.      *Defendant's Value Evidence*

Defendant valued the property using only the sales comparison approach. (Def's Ex A at 19-20.) A key component of Defendant's appraisal is its highest and best use analysis, which

---

[3] Two of the three sales had structures on them but the first of the three, which is the one Plaintiff relies upon, had a home that "caught fire the morning of July 4, 2013," and the second property had an "[o]ld dwelling [that] will need to be removed." (Ptf's Ex 4 at 1, 2 and 4.)

concludes that "[t]he highest and best use/uses is considered to be development with a building suited for drive up use like a coffee kiosk or parking area for an outdoor food court or parking for adjacent property owners." (*Id*. at 17.) Defendant's primary witness Irish, who authored the appraisal report, testified that the subject property has good potential for commercial use, noting that it is on a busy street, and that there is a coffee kiosk in the area that is on a strip of land 28 feet wide, which is only 2 feet wider than the subject property. Irish testified that, in his opinion, the two foot difference in width would not preclude a kiosk on the subject property. He also noted that there was a food court in downtown Medford, presumably on a lot like the subject, although neither the appraisal nor trial testimony was clear on that point. Finally, Irish testified that there is nothing precluding building or development of the subject property based on information from the planning department and that the subject property could be developed after obtaining a conditional use permit.

Defendant's sales comparison approach included five properties that sold between April 2011 and July 2015. (Def's Ex A at 19.) The lot sizes of those properties ranged from a low of 7,405 square feet to a high of 33,977 square feet and sold for a range of $117,500 to $450,000. (*Id*.) All of the properties are located in Medford and have the same zoning as the subject property. (*Id*.) The properties sold for a range of $13.24 per square foot to $18.37 per square foot. (*Id*.) Defendant's adjusted sale prices ranged from a low of $15 per square foot to a high of $18.37 per square foot. (*Id*.) Irish concluded that the adjusted sale prices from the five "comparables supports an estimated market value of $16.00/sf for the [s]ubject property." (*Id*. at 20.) Defendant multiplied the $16 per square foot value estimate by the size of the subject property and arrived at a market value estimate of $89,100 as of January 1, 2014. (*Id*.)

/ / /

/ / /

## III. ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year.

A.   *Real Market Value and Burden of Proof*

ORS 308.205(1) defines real market value: [4]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; ORS 308.210(1).

Because Plaintiff is the party seeking affirmative relief, it has the burden of proof and must establish by a "preponderance" of the evidence that there is an error in the real market value appearing on the assessment and tax rolls. ORS 305.427; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves*, 4 OTR at 312.

To sustain the burden of proof, a taxpayer must "provide competent evidence of the [real market value] of [the subject] property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes [but is not limited to] appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D at 7, WL 879285 (Mar 13, 2012).

/ / /

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

Competent evidence can also include the sale of the subject property. In *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973), the Oregon Supreme Court ruled that "[a] recent sale of the property in question is important in determining its market value." The court went on to state that "[i]f the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then *the sale price*, while certainly not conclusive, *is very persuasive of the market value*." *Id*. (citations omitted).

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

B.      *Plaintiff's Evidence*

Plaintiff relies on the proportionate price it paid for the subject property and the adjoining one half acre lot, and two different comparable sales approaches that rely on different data pools (i.e., different sales). (Ptf's Exs 1, 4 and 5.)

Plaintiff's proportionate value estimate, based on the sale of the subject property, is $25,776. (Ptf's Ex 1.)

Plaintiff's second value estimate, based on the sales comparison approach and utilizing three essentially bare land sales, is $40,017.84. (Ptf's Ex 4 at 1.) However, Curtin explained in her report that the comparable properties had development potential whereas the subject property, in her professional opinion, "cannot be developed." (*Id*.) And Curtin testified at trial that she only relied on one of those three sales (sale #1), which involved a larger 0.23 acre lot, because that lot sold in December 2013, less than one month before the applicable assessment date of January 1, 2014. That property sold for $3.79 per square foot, which Curtin applied to the subject property to arrive at a value estimate of $23,112, a figure approximately $2,500 below Plaintiff's requested value of $25,776.

Plaintiff's second value estimate is based on the sale of ten developed properties that varied widely in terms of the size of the structures on the property, the size of the lots, and of the sale price. (Ptf's Ex 5.) Plaintiff's averaging method for arriving at a land value per square foot of $6.74 is not persuasive. The properties are not similar to the subject property and averaging is not an accepted approach to valuing property. "In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 at *3 (April 25, 2012). Curtin made no adjustments to her ten sales. (Ptf's Ex 5 at 18.) Accordingly, the court places no weight on that valuation approach.

C.     *Defendant's Evidence*

Defendant relied solely on the sales comparison approach. Defendant's comparable sales also vary widely in terms of lot size and price per square-foot. And, Defendant's adjustments are qualitative with no meaningful explanation as to how the adjustments were made.

Defendant contends that the highest and best use would support a number of uses such as a coffee kiosk, a farmer's market, or overflow parking for adjoining property owners. However, Defendant's trial testimony was that a conditional use permit would be required to develop such uses. That adds an element of risk that would have a negative impact on the value of the subject property. Moreover, Defendant failed to demonstrate the need for another coffee kiosk or farmers market, nor gave any information regarding the income such uses might generate. Without that information, it is difficult if not impossible for the court to establish a value for the subject property based on one of those potential uses. In other words, while Defendant asserts that the subject property could have been purchased and used for a coffee kiosk or farmers market, the court was given no information on the potential income from either operation. That

information is necessary for the court to determine the value of the property under an income approach or to evaluate whether such uses would have been economically feasible and attractive to the market participants developing property in the area.

The court also finds that the subject property has access problems. The lot is long and narrow and all of the potential uses Defendant presented involves the flow of vehicles to and from the property. Access to and from the property would require customers coming to a coffee kiosk or a farmer's market to either drive through the lots on one of the adjoining properties or use the alley at the back of the subject property to enter or exit the lot. According to the trial testimony and documentary evidence, that alley abuts a number of adjoining properties including an apartment complex. (Def's Ex A at 11-14; Ptf's Ex 2.) No information was given on traffic flow in the alley but a map of the property shows that the alley is long and narrower than the subject property and leads to a side street off the main road. (*Id.*)

The court has additional concerns about Defendant's highest and best use conclusion and value estimate. The property's zoning allows for a wide variety of commercial uses but it appears that none of the potential buyers that were actively acquiring and redeveloping other properties in the area saw the development potential Defendant insists the subject property enjoys. The evidence also shows that properties in the immediate area of the subject property are not very desirable and may well have been a deterrent to a potential buyer looking at the subject property on or about the January 1, 2014, assessment date. For example, there is fabrication business across the street from the subject property that has a number of buildings including a large industrial building that, according to Defendant's evidence, "appears to be in less than average condition." (Def's Ex A at 7.)

The court recently issued a Decision on the real market value of the adjoining lot that Plaintiff purchased along with the subject property. *General Property Group LLC v. Jackson*

*County Assessor*, TC-MD 150293C (May 19, 2016).  The court concluded that the value of that one half acre lot was $125,000.  (*Id*. at 16.)  That property is about four times as large as the subject property and has a more usable footprint.  Given the unusual footprint of the subject property and of the access issues discussed above, the court concludes that a preponderance of the evidence supports value of $25,000 for the subject property as of January 1, 2014.

IV.  CONCLUSION

The court concludes that the real market value of the subject property, Account 10386513, was $25,000 as of the January 1, 2014, assessment date for the 2014-15 tax year.  The court further concludes that Defendant failed to offer persuasive evidence to support its request for a real market value of $89,100.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the subject property, Account 10386513, was $25,000 as of January 1, 2014.

Dated this ____ day of July 2016.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on July 1, 2016.*